232 F.3d 92 (2nd Cir. 2000)
 LYNNE DIESEL, Plaintiff,
DENNIS J. DIESEL, Plaintiff-Appellee-Cross-Appellant,
v.
TOWN OF LEWISBORO, WAYNE E. BENNETT, "JOHN" RUTLEDGE, first name fictitious, true first name unknown and MARTIN CAMPOS, Defendants,
MAURICE COLEY, PRESTON L. FELTON, AND STANLEY GARRANT, Defendants-Appellees,
THOMAS LARKIN, DENNIS O'CONNELL and JOHN J. NOONAN, Defendants-Appellants-Cross-Appellees.
 Docket Nos. 99-7831(L), 99-7840(XAP)
Nos. 1405(L), 1722(XAP) -- August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: April 24, 2000
Decided: November 13, 2000
 
 Appeal from the judgment of the United States District Court for the Southern District of New York (Brieant, J.) in favor of plaintiff in his 42 U.S.C. § 1983 action against several New York State Police officers.
 
 
 1
 Defendants-appellants appeal the district court's (i) denial in part of their motion for judgment as a matter of law, and (ii) entry of judgment in favor of plaintiff in the remittitur sum of $200,000. Plaintiff cross-appeals (i) the district court's grant in part of the defendants' motion for judgment as a matter of law and (ii) the setting aside of the punitive damages.
 
 
 2
 Judgment reversed. [Copyrighted Material Omitted]
 
 
 3
 DAVID LAWRENCE III, Assistant Solicitor General for the State of New York, New York, NY (Eliot Spitzer, Attorney General of the State of New York, Edward Johnson, Deputy Solicitor General, Mark Gimpel and Mary Lynn Nicolas, Assistant Solicitor Generals, on the brief), for Defendants-Appellants-Cross-Appellees and Defendants-Cross-Appellees.
 
 
 4
 MARC ROWIN, New York, NY (Lynch Rowin LLP, New York, NY, on the brief), for Plaintiff-Appellee-Cross-Appellant.
 
 
 5
 Before: JACOBS, LEVAL and SACK, Circuit Judges.
 
 JACOBS, Circuit Judge:
 
 6
 Dennis Diesel, a New York State Trooper, brought this civil rights action under 42 U.S.C. § 1983 and New York state law against several other members of the New York State Police. Diesel had cooperated with an internal affairs investigation involving misconduct by State Police officers in Peekskill. In a subsequent unrelated incident, Diesel was found early one morning in Lewisboro, passed out or asleep behind the wheel of an official car. Diesel alleged that in retaliation for his cooperation in the Peekskill investigation, the defendants conducted an excessive, prolonged and overzealous investigation of the Lewisboro incident; that they failed to extend to him the form of professional courtesy he terms the "blue wall of silence"; and that their conduct violated Diesel's rights under the First, Fourth and Fourteenth Amendments to the Constitution and New York state law.
 
 
 7
 Following a jury verdict in favor of Diesel, the United States District Court for the Southern District of New York (Brieant, J.) granted in part and denied in part the defendants' motion for judgment as a matter of law, and ordered a new trial limited to determining the damages on the surviving verdicts in favor of Diesel. The second jury returned an award that the district court found to be excessive. Diesel avoided a third trial by accepting the $200,000 remittitur offered by the district court (Fox, M.J.).
 
 
 8
 Defendants-appellants Dennis O'Connell, Thomas Larkin and John Noonan challenge the district court's refusal to grant in full their motion for judgment as a matter of law. Diesel cross-appeals the district court's partial grant of that motion--which dismissed the 42 U.S.C. § 1985 claim against O'Connell, Larkin and Noonan, and dismissed all claims against the other defendants--as well as the court's setting aside of the first jury's award of punitive damages.
 
 
 9
 We hold that (A) a selective enforcement claim under the Equal Protection Clause of the Fourteenth Amendment cannot rest on the allegation that police officers refused to close their eyes to another officer's serious misconduct in accordance with the tradition of the "blue wall of silence"; (B) the investigation into Diesel's misconduct was reasonable as a matter of law both in its initiation and scope; and (C) Diesel failed to prove that he was subjected to retaliatory harassment where the alleged retaliation was a reasonable response to Diesel's own culpable conduct. Accordingly, Diesel was as a matter of law not entitled to any damages. We therefore reverse insofar as the district court entered judgment in favor of Diesel and affirm insofar as the court entered judgment as a matter of law in favor of the defendants.
 
 BACKGROUND
 
 10
 At all times relevant to this action, the parties were members of the New York State Police.
 
 
 11
 Dennis Diesel was a Trooper in Troop K, which serves four counties: Columbia, Dutchess, Putnam, and Westchester. Troop K is divided into zones. Stormville, Diesel's assigned barracks through most of 1995, is in Zone 3. Captain Thomas Larkin was commanding officer of the Stormville barracks. Captain Dennis O'Connell was commanding officer of Troop K and the Peekskill barracks, which is in Zone 4.
 
 
 12
 In November 1995--after Diesel cooperated in the investigation into the Peekskill incident--he was temporarily promoted to the rank of Investigator and assigned to the Executive Services Detail. In this capacity, Diesel served as security officer and driver to then-Lieutenant Governor Betsy McCaughey Ross. In March 1996--following the Lewisboro incident--Diesel was reassigned to his permanent rank of Trooper.
 
 A. The Peekskill Investigation
 
 13
 In September 1994, the State Police Inspection Unit began investigating the possibility that officers in the Peekskill police barracks were covering up a hit-and-run accident involving the brother of a state trooper. Although Diesel was assigned to the Stormville barracks, he was present at the Peekskill barracks on the night in question on an unrelated matter. In September 1995, one of the investigators interviewed Diesel about the alleged cover up, and Diesel provided corroborating evidence about the suspected officers' conduct that the investigator deemed "important."
 
 
 14
 As a result of the investigation, one officer pled guilty to criminal charges and was forced to resign from the police force, and another was suspended for 30 days and transferred to a different command post.[1] Defendant Captain O'Connell, the commanding officer of the Peekskill Barracks, issued a memorandum to his troopers, deploring the incident in terms that are studiously ambiguous. (The text of the memorandum is set out in the margin.)[2] In any event, the investigation and the resulting disciplinary actions were unpopular with the troopers.
 
 
 15
 Diesel testified that he suffered harassment when news of his cooperation leaked to other officers. Letters calling him a rat were left in his locker. He was shunned by his fellow officers, and became "an outcast, like [he] wasn't part of the inner-workings of the State Police."
 
 
 16
 Defendant Lieutenant John Noonan, commanding officer of the Bureau of Criminal Investigation ("BCI") unit at the Peekskill barracks, who had been Diesel's close friend, told Diesel that he was no longer being considered for promotion to the BCI and would be "no longer welcomed at [Noonan's] home." According to Diesel, Noonan stated that Diesel was "pegged as a rat."
 
 
 17
 Captain Larkin, Diesel's commanding officer at Stormville Barracks, relayed to Diesel a request from Captain O'Connell that Diesel avoid patrolling in Peekskill and the rest of Westchester County. Larkin told Diesel that he was "not welcome down there." There was also evidence introduced that Noonan and O'Connell harassed another officer who had cooperated with the investigation.
 
 B. Diesel's Temporary Promotion
 
 18
 In November 1995, Diesel was temporarily promoted to the rank of Investigator and assigned to the Executive Services Detail. Part of his duties in this elite unit included driving the Lieutenant Governor and protecting her. His temporary promotion brought a $10,000 raise, bigger pension benefits, better hours, and the right to use a State Police vehicle while off-duty. It is undisputed that the promotion to the Executive Services Detail was temporary and that Diesel served in this new post at the pleasure of the Superintendent, who could reassign Diesel to his permanent rank of Trooper for any reason at any time.
 
 C. Lewisboro Incident
 1. The Night Before
 
 19
 Between 10:00 and 11:00pm, on February 2, 1996, Diesel dropped the Lieutenant Governor at her Manhattan residence and began to drive back to his Westtown home. Diesel took a sixty-mile detour to Le Chateau, a restaurant in Lewisboro owned by Diesel's friend Joseph Jaffre. Diesel was joined at dinner by Jaffre and by Jaffre's friend, Debra Tosetti. Under the rules of the Executive Service Detail, Diesel remained "on-duty" during this detour.
 
 
 20
 Diesel admitted that he drank some wine during dinner, but the amount is contested. Diesel said that he drank less than one glass and Tosetti corroborated Diesel's account. A week after the incident, Jaffre signed a sworn statement estimating that Diesel drank about one and a half glasses. Still later, at trial, Jaffre testified that the group shared three bottles of wine, from which Diesel drank several glasses. According to his trial testimony, Jaffre believed Diesel became intoxicated.[3]
 
 
 21
 Diesel left the restaurant between 2:00 and 3:00am Just before leaving, he fell in the men's room and injured his nose. Diesel testified that he had slipped on water leaking from a broken toilet. According to Jaffre, the toilet was working and the floor was dry. Tosetti applied two bandages to the bridge of Diesel's bleeding nose.
 
 
 22
 With Diesel's knowledge, Jaffre placed an unopened bottle of wine in the back seat of Diesel's unmarked State Police car. Diesel began driving home, but because of heavy snowfall, he pulled off to the side of the road to wait for the snowplow. He parked his car wholly or partly off the road near the South Salem Firehouse (the "Firehouse"), and fell asleep with the engine running.
 
 2. The Roadside Investigation
 
 23
 Jody Coluccini, who lives across the street from the Firehouse, noticed Diesel's car around 8:00 the next morning. The engine was still running and he was slumped against his steering wheel, asleep and bloodied. Coluccini did not realize that Diesel was a police officer, because Diesel was dressed in a suit (as required by the Executive Services Detail). She tapped on the window of the car, but failed to rouse Diesel. Coluccini called the Somers barracks of the State Police; her husband, Wayne Coluccini, called 911 and then flagged down off-duty, part-time Lewisboro Police Sergeant Robert Rutledge, who was driving by the firehouse.[4]
 
 
 24
 Rutledge drew up behind Diesel's car, placed a precautionary call for an ambulance and pounded on the driver's side window until Diesel woke up. Diesel was unresponsive to questioning, but began to slide his hand down his leg in a way suggesting to Rutledge that the driver was reaching for a weapon. Rutledge drew his gun and ordered the driver to place his hands on the steering wheel. Once Diesel turned his head toward the gun, Rutledge recognized Diesel and holstered his weapon.
 
 
 25
 Soon after, Lewisboro officer Frank Secret, who knew Diesel, happened on the scene. Secret testified that Diesel answered Secret's greeting and questions with a "blank expression." Secret reported the situation to the State Police and recommended that they "get a supervisor down here."
 
 
 26
 Defendant Trooper Maurice Coley was the first State Trooper to arrive at the scene outside the Firehouse, sometime between 8:45 and 9:00am. On Coley's arrival, Secret explained the situation and left. Coley did not know Diesel, nor was he familiar with the Peekskill incident. Coley approached the car with his gun drawn but holstered it quickly. Later that day, Coley submitted a report of the incident:
 
 
 27
 Upon [my] arrival officer [Secret] explained to me that Inv. Diesel was in the vehicle bleeding from the nose and was acting in an intoxicated manner and continued reaching for his leg. Officer [Secret] asked if I could speak to Inv. Diesel. [I] approached the vehicle . . . from [the driver's] side. [I] asked Inv. Diesel what happened to your nose[;] he stated "I Fell." [I] advised Inv. Diesel that he was in no shape to drive and requested the Investigator take the keys out of the ignition and come with [me] in the Troop car to Sp Somers so [Diesel] could call his wife and make arrangements for him to be transported home and park the vehicle. Investigator Diesel refused to cooperate and insisted he could drive home. At this point Inv Diesel took the keys out of the ignition and [I] returned to [my] vehicle.
 
 
 28
 Defendant Lieutenant Felton, who was later designated to head the investigation of Diesel's conduct during the Lewisboro incident, ordered Coley to prepare a supplemental memo "to clarify things he had said in his first memo." The supplement memo, dated February 7, 1996, contained significant additions (as emphasized below):
 
 
 29
 Upon interviewing that individual [slumped over the steering wheel], he verbally identified himself to me as Inv. Dennis J. Diesel. I did not know this investigator prior to this meeting. [I] was advised by a Lewisboro Police Officer to talk to the individual because he was a member of our department and he would not listen to them. The Lewisboro Police Officer also indicated to be cautious because Inv. Diesel kept reaching towards his lower leg. After taking a visual inspection of the individual [I] notice[d] bandages on his nose and blood was flowing profusely from his nostrils. At this time I asked Inv. Diesel "What happened to your nose?" He responded I fell. [I] advised Inv Diesel that it appears to me that you were in a fight. Inv. Diesel responded "OK yes I was in a fight, what do you want from me I'm a fighter." [I] advised Inv. Diesel that he had a very distinct odor of an alcoholic beverage, that [I] smelled when [I] approached the driver['s] side of the vehicle and during [my] further interview inside of vehicle. Inv. Diesel stated "Yeah I had a few drinks and I was tired so I stopped here to rest, can I drive home now!" [I] advised Inv. Diesel that [I] could not allow him to drive in the condition that he was in. Investigator Diesel also stated that the only way he would move was if he could drive the vehicle he was in. [I] did not perform any field sobriety tests because subject refused to exit vehicle.
 
 
 30
 State Troopers James Maxwell and Eugene Pierce arrived to assist Coley. According to Pierce's report on the incident, filed February 3, he was told that Diesel was "possibly intoxicated," but Pierce was "unable to determine if Inv. Diesel had been consuming alcohol, as an identifiable odor of alcohol beverage was not detected." Pierce sat in the car with Diesel, who explained that "his nose had been injured in a fight." Trooper Martin Campos and Sergeant Peter Gobbo also responded to the scene.
 
 
 31
 Defendant Trooper Garrant, the dispatch radio operator at the Somers barracks, relayed Pierce's report. As the district court noted, however, Garrant's dispatches "became somewhat exaggerated": he described Diesel as "highly intoxicated . . . fighting with everyone and . . . bleeding profusely."
 
 
 32
 According to Garrant, "[t]he phone was ringing off the hook" as news spread concerning Diesel. O'Connell, the commanding officer on-duty at the time, arrived at the Firehouse just before 10:30 am. Larkin, who was off duty, drove with Felton 60 miles on icy roads, and arrived at the Firehouse moments after O'Connell. By the time O'Connell, Larkin and Felton arrived, the scene had already attracted Sergeant Gobbo, Troopers Coley, Maxwell, Pierce and Campos, and Lewisboro Police Officer Rutledge.
 
 
 33
 Larkin, O'Connell and Felton approached Diesel's car. Larkin (who had been Diesel's commanding officer) induced Diesel out of the car. Larkin described the scene in a February 8 memo:
 
 
 34
 Description of Investigator Diesel at approximately 10.30 a.m. - flushed face, narrow eyes, two Band-Aids with dried blood over the bridge of his nose. There was blood on the left lapel of his suit jacket. Investigator Diesel had pronounced bad breath; a smell of alcohol was present. It was apparent he had consumed alcoholic beverage but was not intoxicated. . . . Initially Investigator Diesel stated he injured his nose in a fight while off duty.
 
 
 35
 O'Connell's report, dated February 9, states that Diesel "did not appear to stagger or have a problem walking" when he exited his car, and that on subsequent inspection, "[t]here was no smell of alcohol in the car."
 
 
 36
 3. The Investigation at the Lewisboro Barracks
 
 
 37
 Larkin decided to continue the investigation at the nearby Lewisboro barracks. Sergeant Gobbo drove Diesel to the barracks in Diesel's car. On arrival, Diesel went to the restroom for approximately twenty minutes. Trooper Coley explained to the superior officers that Diesel had been reaching for his ankle holster. Meanwhile, Senior Investigator Matthew J. Laspisa, Diesel's Executive Services Detail supervisor at the time, arrived at the Lewisboro barracks. On O'Connell's recommendation, Laspisa secured Diesel's firearm.
 
 
 38
 Laspisa testified that in his opinion, the response by the officers was disproportionate to the situation:
 
 
 39
 At Lewisboro, later, not immediately when I arrived, there came a point where -- I'm not sure I used the word "silly." I just didn't understand why there was so many of us there at that point still, that it should be toning down a little bit, since we didn't have a complainant and things were in hand as opposed to what we were told on the telephone earlier [by Garrant].
 
 
 40
 Based on exaggerated reports of Diesel's condition, Lieutenant Noonan requested that the Hostage Negotiating Team and the Criminal Investigations Unit respond to the scene and head for the Firehouse.[5] En route, Noonan learned that everyone had gone to the Lewisboro barracks, so he went there, arriving around 11:00am. Noonan's memo described Diesel as "tired and worn," and noted:
 
 
 41
 His responses to questions were slow, vague and incomplete. His thought process and physical demeanor were similar to a person who is impaired. [I] was unable to ascertain whether or not his condition was a result of alcohol, being injured or lack of sleep. However, the odor of an alcoholic beverage was noticed emanating from his person.
 
 
 42
 Seated at a desk in the Lewisboro barracks, Diesel was interviewed by Larkin (with O'Connell present and asking a few questions), and later by Felton. At trial, Diesel testified that the officers asked repetitive questions that Diesel could not answer without violating his confidentiality agreement with the Executive Services Detail. The officers maintain that the interview was stalled by Diesel's evasive answers and uncooperative manner.
 
 
 43
 When Noonan arrived, he privately asked Diesel whether he had a drinking problem. This was the only questioning in the Lewisboro barracks at which Noonan was present. At some point, Laspisa said, "I hope this has nothing to do with Peekskill," and Noonan responded that "that was nonsense, that it wasn't a setup, that nobody placed Dennis on Route 35, and that Dennis was there because of his own actions." Diesel also testified that Laspisa was ordered out of the room by Larkin, who angrily told Laspisa that Diesel "was not being treated like an animal, he is not being treated like a criminal, mind your own business in this investigation."
 
 4. The Investigation at the Somers Barracks
 
 44
 Around 11:30 am, O'Connell, Noonan, Felton, Laspisa and Diesel went to the Somers barracks, arriving around noon, and Larkin went home. Diesel alleged that the move to Somers was designed to humiliate him further by prolonging and drawing attention to the investigation. In their post-trial motion and on appeal, the defendants claim that the Lewisboro barracks "lacked the space and supplies need[ed] to conduct the first phase of the investigation."
 
 
 45
 At Somers, Diesel again visited the men's room, after which the investigation resumed. Felton conducted the bulk of the questioning and O'Connell and Noonan occasionally interjected questions. Diesel gave a fuller account of himself than he had given at Lewisboro, and was ordered to give a written statement. Over his objection, Diesel was also ordered to remove the bandages on his nose so that pictures of his injury could be taken. As Diesel anticipated, the wound began to bleed again. At 2:30pm--six hours after Officer Rutledge first woke him up outside the firehouse--Diesel was released and driven home by Laspisa.
 
 5. Felton's Investigation
 
 46
 Because of Diesel's personal relationships with Larkin, Noonan and O'Connell--and their prior conflict with him over the Peekskill investigation--Larkin decided that none of them should lead the investigation of Diesel's misconduct. At some point in the day, Larkin assigned the investigation to Felton, who was experienced in internal affairs, was new to the troop, did not know Diesel, and had no connection to the Peekskill investigation.
 
 
 47
 Over the next several weeks, Felton interviewed and took statements from all the persons involved in the incident. It was during this time that Felton ordered Trooper Coley to supplement his first memo.
 
 
 48
 Felton's Investigation Report concluded that Diesel had committed some but not all of the administrative infractions charged against him:
 
 
 49
 Although it cannot be established that Investigator Dennis Diesel was intoxicated, this investigation has determined that he consumed alcoholic beverages while in possession and control of a Division vehicle. Investigator Diesel was still partially under the influence of alcohol when Trooper Coley arrived. It is evident that he consumed more than the two glasses of wine he alluded to in his statement to still have an observable odor of an alcoholic beverage hours after the consumption of the beverage. Additionally, he had no authorization to operate the Division vehicle and drive it to Le Chateau. His trip to the restaurant was clearly outside of his established route of travel to his residence.
 
 
 50
 As to the specific allegations, Felton concluded:
 
 
 51
 This investigation has determined that the allegation that Investigator Diesel operated his Division vehicle outside of Division guidelines is founded. The allegation that Investigator Diesel operated his Division vehicle while having consumed alcoholic beverages is founded. This investigation also established that Investigator Diesel possessed alcoholic beverages while in a Division vehicle. The allegation that the member was found asleep, with his Division vehicle parked within a westbound driving lane of State Route 35 and that he refused to move his vehicle is founded. The allegation that he was uncooperative with members of another police agency and Division members who attempted to assist him is founded. The allegation that the member was found in an intoxicated condition and that he was fighting with subjects at the South Salem Firehouse cannot be sustained.
 
 
 52
 Felton "[r]ecommend[ed] appropriate administrative action." Felton's superior officer, First Deputy Superintendent Wayne Bennett, adopted the Investigation Report and determined that Diesel had violated several regulations of the New York State Police. A letter of censure was placed in Diesel's personnel file; the Superintendent transferred him from the Executive Services Detail; and Diesel was reassigned to the Newburgh barracks in his permanent rank as Trooper.
 
 
 53
 Diesel was never arrested or charged criminally.
 
 
 54
 None of the individual defendants was personally involved in the Peekskill incident. But all of them except Felton and Coley knew Diesel prior to the Lewisboro incident, knew of the Peekskill investigation, and were aware of Diesel's involvement in it. At the time of the Lewisboro incident, neither Felton nor Coley knew Diesel personally. Felton knew about Diesel's involvement in the Peekskill investigation, but Coley had not heard of it.
 
 6. Diesel's Pain and Suffering
 
 55
 Diesel testified at trial that he was humiliated by the circumstances of the investigation, including the small interview rooms, the repetitive questioning, the request for hostage negotiators, the drawing of guns by Coley and Rutledge, the reopening of his wounds, and the additional attention caused by the move to the Somers barracks. Following the Lewisboro incident, Diesel feared that he could not trust his fellow officers to provide him with backup should it be necessary.
 
 
 56
 Leaked details of the investigation appeared in newspaper articles; the story of Diesel's misconduct was broadcast on the "Imus in the Morning" radio program. Diesel was no longer invited to participate in elementary school programs. He was shunned by his police officer friends. His wife and sister testified that as a result of the incident he became depressed, withdrawn and short-tempered with his children. He told his sister that "a part of his life was taken on route 35."
 
 D. Procedural History
 
 57
 Diesel brought this civil rights action pursuant to 42 U.S.C. §§ 1983 and 1985 and New York state law, alleging (inter alia) that defendants O'Connell, Larkin, Noonan, Felton, Coley and Garrant violated his First Amendment rights by retaliating against him for his participation in the Peekskill investigation.[6] And in connection with the Lewisboro incident, Diesel alleged that they violated his Fourteenth Amendment right to equal protection through selective enforcement, violated his Fourth Amendment right to be free from unreasonable searches and seizures, falsely imprisoned him in violation of New York law, and conspired to violate his constitutional rights in violation of 42 U.S.C. § 1985.
 
 
 58
 The case was tried before a jury, which found as follows:
 
 
 59
 O'Connell, Larkin and Noonan violated Diesel's First Amendment rights;
 
 
 60
 All six defendants violated Diesel's Fourteenth Amendment rights;
 
 
 61
 O'Connell, Larkin, Noonan and Felton violated Diesel's Fourth Amendment rights;
 
 
 62
 O'Donnell, Noonan and Felton (but not Larkin) falsely imprisoned Diesel; and
 
 
 63
 Larkin, O'Connell, Noonan, Felton and Coley (but not Garrant) violated § 1985.
 
 
 64
 The jury awarded $500,000 in compensatory damages, and a total of $155,000 in punitive damages (O'Connell: $50,000; Larkin: $20,000: Noonan: $50,000; Felton: $20,000: Coley: $10,000: Garrant: $5,000).
 
 
 65
 The defendants moved for judgement as a matter of law, and alternatively for a new trial. The motion was granted in part and denied in part. The court observed that "it has no confidence in the correctness of any of our jury's factual inferences," but properly deferred to the jury's resolution of conflicting testimony and weighing of witness credibility. On that basis, the court (i) granted judgment as a matter of law in favor of Felton, Coley and Garrant on all the claims; (ii) granted judgment as a matter of law as to all defendants on the § 1985 claim; and (iii) upheld the §1983 verdicts against O'Connell, Larkin and Noonan (on the First, Fourteenth, and Fourth Amendment claims) and the false imprisonment verdict against O'Connell and Noonan.
 
 
 66
 As to the amount of damages (against the remaining defendants: O'Connell, Larkin and Noonan), the district court concluded that Diesel was entitled to compensatory damages for pain and suffering, but that he was entitled to no more than nominal damages for the adverse employment actions (because Diesel would have been censured and reassigned for his misconduct even without unconstitutional retaliation), and that punitive damages were inappropriate (because there was insufficient evidence of "evil, reckless or callous" conduct). In light of these rulings, the $500,000 compensatory damages award was found to be grossly excessive. The court therefore granted a new trial on damages unless Diesel accepted a remittitur of $100,001.
 
 
 67
 Diesel declined the remittitur, and a jury trial on damages was held before Magistrate Judge Fox. The district court limited this second trial to "defendants' unconstitutionally retaliatory, selective investigation of the Lewisboro matter, and the harsh treatment and excessive detention of plaintiff on February 3, 1996." The jury was instructed on the underlying facts of the Lewisboro incident and the liability verdicts against O'Connell, Larkin and Noonan. Diesel reintroduced the evidence relating to his pain and suffering, and claimed to have suffered "psychological trauma." He admitted that he never sought medical help for the psychological distress, an omission he attributed to his fear that his resort to such help would have been used by the defendants as an excuse to fire him.
 
 
 68
 This second jury awarded Diesel $1.5 million in compensatory damages. O'Connell, Larkin and Noonan again moved for a new trial on damages, which the court granted unless Diesel accepted a remittitur, this time in the amount of $200,000. Diesel accepted, and these cross-appeals followed.
 
 DISCUSSION
 
 69
 We review de novo a district court's resolution of a motion for judgment as a matter of law, see Valley Juice Ltd. v. Evian Waters of France, Inc., 87 F.3d 604, 613 (2d Cir. 1996), and we apply the same standard as the district court itself was required to apply, see LeBlanc Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995). In ruling on a motion for judgment as a matter of law, we must therefore consider the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences from the evidence that the jury might have drawn in that party's favor. See Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988). We cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury. See id.; LeBlanc, 67 F.3d at 429. The motion may be granted "[o]nly if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party]." LeBlanc, 67 F.3d at 429 (internal quotation marks omitted).
 
 I. The Appeal
 
 70
 Diesel's claims against the defendants-appellants fail as a matter of law.
 
 A. Fourteenth Amendment Claims
 
 71
 The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S. Ct. 3249 (1985); LaTrieste Restaurant & Cabaret v. Village of Port Chester, 188 F.3d 65, 69 (2d Cir. 1999). Diesel's equal protection claim is not a challenge to an enactment; he challenges the selective enforcement of the law against him. Although we have described selective enforcement as a "murky corner of equal protection law in which there are surprisingly few cases," LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir. 1980), we have held that such a claim will succeed where a plaintiff proves that:
 
 
 72
 (1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.
 
 
 73
 Id. at 609-10; see also, Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999); LaTrieste Restaurant & Cabaret, Inc. v. Village of Portchester, 40 F.3d 587, 590 (2d Cir. 1994); FSK Drug Corp. v. Perales, 960 F.2d 6, 10 (2d Cir. 1992). Diesel claims that (1) the defendants' vigorous investigation of the Lewisboro incident and the charges brought against him deviated from the indulgent treatment afforded similarly situated police officers, and (2) the difference in treatment was motivated by the defendants' intent to punish Diesel for his cooperation in the Peekskill investigation.
 
 
 74
 We conclude that Diesel has failed to prove that he suffered a cognizable constitutional injury. Put bluntly, Diesel complains that was entitled to the benefits of what he calls a blue wall of silence, behind which he expected his fellow officers to cover up his misconduct as he alleges is done for other officers who get in trouble. Essentially he claims that he was entitled to have his misconduct ignored or concealed.
 
 
 75
 Diesel's asserted constitutional injury includes ostracism, the alienation of friendships, and the withholding of preferential treatment by fellow police. But the law is ineffective to compel friendship or courtesy. And Diesel has no constitutional right to treatment by the police that would immunize him from the consequences of serious misconduct; to recognize a right to such differential treatment would stand the Equal Protection Clause on its head.
 
 
 76
 We recognize that police organizations may well extend "professional courtesy" and indulgence to colleagues, and may retaliate against officers who violate the rules of courtesy by refusing to extend courtesy to them. Nonetheless, civil damages are not available by reason of a police officer's refusal to turn a preferentially blind eye toward another's serious infraction. A selective enforcement verdict in this case would punish O'Connell, Larkin and Noonan because they did their duty by investigating the misconduct of a fellow police officer instead of covering it up. And, Diesel could have avoided such retaliation simply by conducting himself within the applicable laws and regulations. Cf. LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir. 1980) (noting that "equal protection does not require that all evils of the same genus be eradicated or none at all"). In short, this equal protection claim alleges no differential treatment; instead, it alleges that Diesel was deprived of a privileged status to which he had no constitutional entitlement.
 
 
 77
 Although the thrust of Diesel's selective enforcement claim is that he was not the beneficiary of selective enforcement, we consider two alternative theories that he arguably raised:
 
 
 78
 1. Diesel argues that, compared to the average citizen, the investigation into his alleged traffic violations and drunk driving was more vigorous by reason of his speech during the Peekskill investigation. But Diesel offered no evidence comparing how similarly situated members of the general public are treated and investigated. There was no evidence that traffic offenses or drunk driving are winked at and escape investigation, and therefore no evidence that the defendants-appellants treated Diesel selectively as compared to similarly situated ordinary people.
 
 
 79
 2. Diesel also argues that the defendants-appellants selectively investigated him for alleged administrative violations of the police conduct regulations. On this ground, Diesel had to show that police officers generally did not enforce the regulations against each other, but that the defendants vigorously investigated the Lewisboro incident because of Diesel's cooperation in the Peekskill investigation. As this claim is framed, the laws that are selectively enforced are not laws of general applicability; by definition, they apply to law enforcement officers only.
 
 
 80
 Again, the record is insufficient as a matter of law to support the jury's verdict. Diesel asserts that there is a custom in the police department that allows officers to drink and drive a state vehicle provided they do not become intoxicated. But the district court found that "plaintiff failed to present evidence of another police officer who had not been disciplined despite having committed similar transgressions."
 
 
 81
 "[K]nowledge is ordinarily required to establish the first element [of a selective treatment claim]." LaTrieste, 188 F.3d at 70. In the absence of proof that the defendants-appellants knew other officers were treated differently, Diesel "would be hard-pressed to show that [he] was singled out for selective treatment." Id. 69.[7]
 
 
 82
 On this record, the jury's verdict "could only have been the result of sheer surmise and conjecture." LeBlanc, 67 F.3d at 429 (internal quotation marks omitted). Accordingly, Diesel's claim that the administrative investigation violated his Fourteenth Amendment rights fails as a matter of law.
 
 
 83
 B. Fourth Amendment and False Imprisonment Claims
 
 
 84
 The district court usefully separated Diesel's Fourth Amendment and false imprisonment claims into (i) those bearing on the initiation of the investigation, and (ii) those bearing on its length and nature. See Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865 (1989) (citation omitted) ("[T]he 'reasonableness' of a particular seizure depends not only on when it is made, but also on how it is carried out."). The district court ruled that the claims arising out of the initiation of the investigation were not sustainable on the evidence.[8] We agree, and Diesel does not challenge this ruling.
 
 
 85
 As to the length and nature of the investigation, the court upheld the Fourth Amendment verdict against O'Connell, Larkin and Noonan and the false imprisonment claim against O'Connell and Noonan because "at some late point the defendants' detention and repetitious interrogation of plaintiff became excessive and unreasonable." The court deferred to the jury's credibility and weight-of-the-evidence determinations that the questioning was unreasonably repetitive and time-consuming, that the order to remove the nose bandages was unreasonable and intended to inflict pain, and that the relocation to the Somers barracks was a pretext for prolonging Diesel's humiliation and maximizing the number of officers who witnessed Diesel's predicament.
 
 
 86
 On our review of the record, however, we conclude that the defendants were entitled to judgment as a matter of law. Even crediting Diesel's evidence that the questioning was repetitive and that he was cooperative and forthright in his responses, the investigation was, as a matter of law, reasonable in length and scope. A "reasonable and fair minded [jury] could not arrive at a verdict against" the defendants-appellants. LeBlanc-Sternberg, 67 F.3d at 429.
 
 
 87
 Diesel complains of the investigatory proceedings at the roadside, at the Lewisboro barracks and at the Somers barracks. Altogether, these proceedings lasted about six hours, from Mrs. Coluccini's discovery of Diesel at 8:30 a.m. to Diesel's release at 2:30pm. But the defendants-appellants were actually involved for a significantly shorter period of time. Larkin and O'Connell first arrived at the roadside at 10:30am. Between their arrival and the trip shortly thereafter to the Lewisboro barracks, only Larkin spoke with Diesel, and they had only a brief conversation. Sergeant Gobbo--who is not one of the defendants-appellants--drove Diesel to the Lewisboro barracks. On his arrival there, Diesel spent 20 minutes alone in the restroom. Noonan did not become involved in the investigation at all until he arrived at Lewisboro at 11:00am; and even then, he spoke with Diesel for a few minutes only, inquiring about Diesel's drinking. Larkin finally began questioning Diesel at the Lewisboro barracks, and O'Connell participated intermittently. When the group moved to Somers at 11:30am, Diesel traveled alone with Laspisa.
 
 
 88
 To summarize, by the time the group arrived at the Somers barracks at noon, (i) Noonan had been in Diesel's presence for an hour but had spoken to him only briefly; (ii) Larkin and O'Connell had arrived 90 minutes earlier, but Diesel was out of their presence for the drive from the Firehouse to the Lewisboro barracks, the 20 minutes Diesel spent freshening up in the bathroom, and the 30 minute drive to the Somers barracks; and (iii) Larkin, who also arrived 90 minutes earlier, had left.
 
 
 89
 The investigation at the Somers barracks ended two and a half hours later when Diesel was released. It is undisputed that during that period, Diesel went to the bathroom, and (as he was required to do by the terms of his employment contract) prepared a written statement. In the remainder of the two and a half hours, Diesel was questioned about his conduct and his wounds were photographed. For the most part, however, the questioning at Somers was conducted by Felton, who had been chosen to lead the investigation expressly because he and Diesel had no history of bad blood. Since Felton had good reason to start from scratch, his examination cannot render the conduct of O'Connell and Noonan unreasonable.
 
 
 90
 The investigation conducted by the defendants was therefore considerably shorter and less intrusive than Diesel claims. Furthermore, the order to remove the bandages was reasonable under the circumstances, as Diesel's injury was circumstantial evidence of his misconduct. And the relocation to Somers, even if the jury believed that it was unnecessary and retaliatory, does not in itself rise to the level of a constitutional violation.
 
 
 91
 Diesel argues, however, that the cumulative effect of the questioning, the removal of the bandages, and the relocation to Somers is sufficient to support the jury's verdict. We disagree. "[A] Fourth Amendment examination of a search or seizure . . . requires a contextualized reasonableness analysis that seeks to balance the intrusion on privacy caused by law enforcement against the justification asserted for it by the state." Lauro v. Charles, 219 F.3d 202, 209 (2d Cir. 2000). It is clear that any intrusion on Diesel's Fourth Amendment interest was quite limited, even in a cumulative sense, when considered in light of the "substantial public interest in ensuring the appearance and actuality of police integrity." See Biehunik v. Felicetta, 441 F.2d 228, 230 (2d Cir. 1971). Diesel argues that the intrusion was excessive as compared with the wink or perfunctory look that his misconduct would have gotten if he had been in the good graces of his fellow officers, but, for reasons discussed above, that is not a valid measure.
 
 
 92
 Under the circumstances, we conclude that the defendants-appellants' conduct was, as a matter of law, not unreasonable in the light of the circumstances of Diesel's conduct. A member of the Executive Services Detail whose responsibility it was to protect and drive the Lieutenant Governor was discovered by a civilian in broad daylight, parked on the side of a road in an official state vehicle, passed out over his steering wheel with the engine running, blood on his face and clothes, bottle of wine in view on his back seat. When he was awakened, local law enforcement officials formed the impression that he was reaching for a weapon. He admitted drinking the night before. He was uncooperative and unresponsive to the police officer who found him. He gave inconsistent and at times belligerent answers to the officer's questions about his injury. We conclude that these circumstances justify judgment as a matter of law dismissing the Fourth Amendment and false imprisonment claims. See id. at 230-31 (noting that "policemen, who voluntarily accept the unique status of watchman of the social order, may not reasonably expect the same freedom from governmental restraints which are designed to ensure his fitness for office as from similar governmental actions not so designed").
 
 C. First Amendment Claims
 
 93
 As to Diesel's First Amendment retaliation claim, the district court (i) set aside the award of compensatory damages attributed to Diesel's censure and reassignment, (ii) awarded nominal damages for these adverse employment actions, and (iii) upheld the jury's verdict insofar as it awarded compensatory damages for the pain and suffering caused by retaliatory harassment. We (i) affirm the setting aside of Diesel's damages for the censure and reassignment, (ii) reverse the nominal damages award because no damages are recoverable when the adverse action would have occurred regardless of the protected conduct, and (iii) overturn the pain and suffering damage award because Diesel failed to prove that he suffered a cognizable constitutional injury.
 
 
 94
 To prevail on a First Amendment retaliation claim, a public employee must establish: "[1] that the speech at issue was protected, [2] that he suffered an adverse employment action, and [3] that there was a causal connection between the protected speech and the adverse employment action." Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir. 1994); see also Mount Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 283-87 (1977); Connell v. Signoracci, 153 F.3d 74, 79 (2d Cir. 1998). The causal connection must be sufficient to support the inference "that the speech played a substantial part in the employer's adverse employment action." Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 780-81 (2d Cir. 1991). If a plaintiff establishes these three elements, a defendant may avoid liability by showing "by a preponderance of the evidence that it would have reached the same decision as to [the employment action] even in the absence of the protected conduct." Mount Healthy, 429 U.S. at 287.
 
 1. Protected Speech
 
 95
 The defendants-appellants first argue that Diesel did not engage in protected speech during the Peekskill investigation because answering questions about an internal investigation is one of the day to day responsibilities of Diesel's job, and therefore cannot fairly be characterized as his expression on a matter of public concern. However, the defendants-appellants did not object to the district court's jury instruction, which stated that Diesel's speech was, as a matter of law, protected speech on a matter of public concern:
 
 
 96
 You are instructed that Mr. Diesel had the right under the First Amendment to your Constitution to give a statement about the Peekskill incident, and in so doing, his statement, which is a form of speech, was protected by the Constitution because it was addressed to a matter of public concern.
 
 
 97
 Nor did the defendants raise the "protected speech" argument in their motion for judgment as a matter of law. This argument has therefore been waived. "[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." Greene v. United States, 13 F.3d 577, 586 (2d Cir. 1994); see also Singleton v. Wulff, 428 U.S. 106, 120 (1976) ("[A] federal appellate court does not consider an issue not passed upon below.").
 
 
 98
 While we have discretion to address the merits of an otherwise waived argument, we are disinclined to exercise it where the argument requires "new evidence or factual findings." Ebker v. Tan Jay Int'l, Ltd., 739 F.2d 812, 822 (2d Cir. 1984). The argument in question is fact sensitive: "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 146 (1983). Because the defendants-appellants never raised this argument in the district court, Diesel was not given the chance to develop further the context of his participation in the Peekskill investigation or the scope of his day-to-day duties. We therefore decline to address the defendants-appellants' untimely argument.
 
 
 99
 2. Damages for the Adverse Employment Actions
 
 
 100
 Having set aside the compensatory damages award, the district court erred in awarding nominal damages. We assume arguendo that Diesel carried his burden of establishing that retaliation for his protected speech played a substantial part in causing the adverse employment action. The defendants-appellants, however, established that Diesel would have been investigated, censured, and reassigned "even in the absence of the protected conduct." Mount Healthy, 429 U.S. at 287; see also Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) ("[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken on the proper reasons alone.").
 
 
 101
 The district court concluded that "plaintiff's own misconduct was in [and] of itself an appropriate justification for the disciplinary actions taken against him." That ruling is soundly supported by Diesel's admission that he violated at least three applicable regulations: (i) he took his official state vehicle on a detour without prior approval from his supervisor, (ii) he consumed alcohol before driving his state vehicle, and (iii) he possessed an unauthorized bottle of alcohol in his state vehicle. Nor does Diesel dispute that he was found passed out in his vehicle parked partially in the road with the motor running, or that he gave inconsistent, incoherent, and belligerent answers to a police officer's questions. Diesel's conduct as a whole would foreseeably bring discredit and embarrassment to the State Police and the Lieutenant Governor, and clearly warranted some measure of censure or punishment. We decline to review those measures via constitutional litigation. Accordingly, we affirm the district court's disallowance of compensatory damages flowing from those adverse employment actions.
 
 
 102
 The district court's only error was to award nominal damages for the censure and reassignment. Plaintiffs may recover nominal damages under § 1983 "in the absence of proof of actual injury." Atkins v. New York City, 143 F.3d 100, 103 (2d Cir. 1998). But where (as here) the defendants have met their burden under Mount Healthy of proving that the adverse action would have occurred in the absence of the protected conduct, there is no liability. A plaintiff's "version of events would be insufficient as a matter of law even if true (even if the defendants were retaliating against protected conduct) if there were proper, non-retaliatory reasons for his punishment." Graham, 89 F.3d at 81 (emphasis added); see also Sher v. Coughlin, 739 F.2d 77, 82 (2d Cir. 1984) (affirming summary judgment dismissal of a §1983 retaliation claim where there was a valid non-discriminatory reason for the adverse action); Wytrwal v. Saco School Bd., 70 F.3d 165, 170-71 (1st Cir. 1995) (finding no liability where defendant proved employment decision would have been made regardless of the retaliation). Absent liability, damages--nominal, compensatory or punitive--are unavailable.
 
 3. Damages for the Retaliatory Harassment
 
 103
 The district court denied the defendants-appellants' motion to vacate the award of damages for Diesel's pain and suffering. We reverse because Diesel failed to prove that the defendants-appellants actually retaliated against him.
 
 
 104
 Diesel's retaliatory harassment claim does not fit the pattern of retaliation cases alleging an adverse employment action. Nevertheless, a plaintiff may recover for pain and suffering caused by retaliatory harassment, because "the basic purpose of a Section 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." Carey v. Piphus, 435 U.S. 247, 254 (1978); see Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."); see also Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987). Diesel, however, failed to prove that the defendants-appellants acted in a way that was retaliatory in the sense that their actions differed from how they would have acted absent Diesel's protected conduct.
 
 
 105
 We have already concluded that (1) it was reasonable to initiate the investigation into Diesel's misconduct, (2) the defendants' participation in the investigation was reasonable in scope and nature, (3) the defendants-appellants established that even in the absence of Diesel's speech, his misconduct would have precipitated an investigation (and disciplinary action), and (4) Diesel's right to equal protection did not guarantee him the special indulgence that police officers are reliably supposed to give each other. All that is left of Diesel's retaliatory harassment claim is that because of animus arising from the Peekskill incident, the defendants-appellants derived some pleasure from Diesel's misfortune. Such "incidental satisfaction" has no constitutional significance. Vezzetti v. Pellegrini, 22 F.3d 483, 488 (2d Cir. 1994); see also Bernheim v. Litt, 79 F.3d 318, 327 (2d Cir. 1996) (Jacobs, J., concurring) (stating that a § 1983 plaintiff may not "demand that the court suppress all manifestations of annoyance by a person" offended by the plaintiff's protected speech).
 
 
 106
 Conduct that is properly initiated, reasonably executed, independently justified and equally administered--regardless of any animosity towards the plaintiff--does not give rise to a constitutional claim for retaliatory harassment.[9] See Ingraham v. Wright, 430 U.S. 651, 674 (1977) ("There is, of course a de minimis level of imposition with which the Constitution is not concerned."); ACLU v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993); cf. Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999) (in banc) ("[T]he definition of adverse action is not static across contexts. Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse."). Accordingly, we grant judgment as a matter of law in favor of the defendants-appellants on the First Amendment retaliation claim.
 
 
 107
 Defendants-appellants' challenges to evidentiary rulings and the size of the damages award are moot.
 
 II. The Cross-Appeal
 
 108
 Diesel challenges the district court's grant of the defendants' motion for judgment as a matter of law with respect to (1) compensatory damages flowing from Diesel's censure and reassignment, (2) the verdicts against defendants-appellees Felton, Coley and Garrant, (3) the punitive damages award, and (4) the § 1985 conspiracy claim. We affirm the district court's decisions:[10]
 
 
 109
 1. We have already rejected Diesel's argument as to the censure and reassignment damages. See supra, Part I.C.2. The defendants carried their burden under Mount Healthy to prove that the adverse employment action would have been taken in the absence of any protected conduct.
 
 
 110
 2. The district court properly entered judgment as a matter of law in favor of Felton, Coley and Garrant. We have already concluded that O'Connell, Larkin and Noonan did not violate Diesel's rights in the conduct of the investigation. Coley and Garrant played a much more limited role than the others and are also entitled to judgment as a matter of law. Coley was not even aware of the Peekskill investigation when he met Diesel for the first time during the Lewisboro incident. Felton led the investigation, but there is no evidence to support an inference that his actions were motivated by Diesel's cooperation in the Peekskill investigation. Felton had previously worked in the Internal Affairs Department, and testified that he "applaud[s] those [officers] who come forward when other [officers] engage in misconduct." The fact that Felton ordered Coley to supplement his initial report about the Lewisboro incident is insufficient to support the verdict.
 
 
 111
 3. Because we conclude that the defendants' motion for judgment as a matter of law should have been granted in its entirety, the punitive damages issue is moot.
 
 
 112
 4. The district court granted judgment as a matter of law on the § 1985 conspiracy claim on the ground that Diesel failed to prove that there was any "class-based, invidiously discriminatory animus behind the conspira[cy]." Jews for Jesus v. Jewish Comm. Rel. Council of N.Y., 968 F.2d 286, 291 (2d Cir. 1992) (internal quotation marks omitted). This decision was clearly correct.
 
 
 113
 On cross-appeal, Diesel argues that his conspiracy claim was actually brought under § 1983, and that therefore no evidence of racial or class based animus was needed. Diesel raises this argument on appeal only in a footnote in his primary brief. "We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review." United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir. 1993). His subsequent discussion of this argument in the text of his reply brief does not save this argument from waiver. See Thomas v. Roach, 165 F.3d 137, 145-46 (2d Cir. 1999).
 
 
 114
 Moreover, it would not assist Diesel if we reached the issue. Diesel argues that the district court sufficiently charged the jury on his purported § 1983 claim. But the relevant jury instruction specifically stated that Diesel's conspiracy claim "arises under Section 1985, rather than 1983." Because Diesel did not object to this instruction, he forfeited his challenge to it here. See Fogarty v. Near N. Ins. Brokerage, Inc., 162 F.3d 74, 79 (2d Cir. 1998) ("A party who fails to object to a jury instruction at trial waives the right to make that instruction the basis for an appeal.").
 
 CONCLUSION
 
 115
 We reverse insofar as the district court entered judgment in favor of Diesel and affirm insofar as the court entered judgment in favor of the defendants, and we remand for entry of judgment dismissing the complaint.
 
 
 
 Notes:
 
 
 [1]
 The district court observed that "[t]he litigation strategy of both sides at trial appeared to have been served by maintaining a certain aura of mystery about the Peekskill Incident, with the result that testimony concerning it was less clear than it could have been."
 
 
 [2]
 Captain O'Connell's memo stated:
 Recent rumors regarding an internal investigation in Zone Four have cast an unfortunate shadow over our Zone, certain headquarters Members and the State Police in general. At a time in State Police History when we seem to be moving forward with a solid front an incident occurred which can serve no purpose but to polarize us. Forces that are already in place seem to be moving us in a direction in which there are no winners. Nobody wants that.
 Superintendent McMahon has often stated that people are the most important resources that we have. He is right. I want you to know that if you ever have any problems, whether personal or business related, you can call me. If I am not at work, I am at home. If you get the answering machine or one of my kids, beep me. Any time, any place.
 I know that I am not a panacea for everybody's problems, but I am there and I think Troopers are great.
 
 
 [3]
 Diesel contends that Jaffre changed his account, and lied at trial, after being pressured by a visit from a trooper and an anonymous phone call. Jaffre admitted at trial to meeting with the officer and receiving the call, but he denied being influenced. He claimed that he lied in the sworn statement because Diesel asked him to, and decided to tell the truth at trial once he learned what happened after Diesel left the restaurant and that Diesel was suing the other officers.
 
 
 [4]
 The district court noted an "oddity in the record" concerning the 911 call. Wayne Coluccini testified that "[a] local policeman came to my house later on that morning. . . . The time was 10:30 maybe or so. He mentioned to me that somehow or another, the 911 call that I made was not recorded somehow. I don't know why. But he asked me to call 911 again about the incident." Mr. Coluccini called 911 again and simulated the "exactly same" call. The district court commented:
 The mysterious failure to preserve the original record of the original 911 call, together with the perceived necessity of having Mr. Coluccini manufacture another call, were never satisfactorily explained at trial. This rather bizarre effort on the part of somebody to reconstruct the record of Mr. Coluccini's call to 911 supports an inference that the original recording disappeared as part of a coverup by somebody, which was abandoned when the identity of the driver became known. There is, however, nothing to tie the destruction or unexplained disappearance of the tape of Coluccini's first call to any defendant in this case.
 
 
 [5]
 These units never actually became involved in the investigation.
 
 
 [6]
 Diesel also sued the Town of Lewisboro, Bennett, Rutledge and Campos, but his claims against these defendants were dismissed before trial. Similarly, Diesel's wife's claim of loss of consortium was also dismissed. None of these claims is relevant to this appeal.
 
 
 [7]
 In LaTrieste, we left open the possibility that "selective treatment could be shown where, for example, proof was offered that a municipality did not know of prior violations because it adhered to a see-no-evil policy of not enforcing an ordinance, and then abandoned that policy with respect to a violator engaged in protected activity." Id. at 70 n.1. But like LaTrieste, Diesel "has not explicitly called our attention to proof supporting this, or any other such alternative theory of selective treatment. Accordingly, any such alternative arguments are waived." Id. (citing Norton v. Sam's Club, Inc., 145 F.3d 114, 117 (2d Cir. 1998)).
 
 
 [8]
 The defendants clearly had probable cause to detain or arrest Diesel (though Diesel was never in fact arrested) given the reports of his possible intoxication, his refusal to cooperate with other officers, and the discovery of him in a car on the side of the road, passed out and bleeding. See Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989) ("[P]robable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."); Zanghi v. Incorporated Village of Old Brookville, 752 F.2d 42, 45 (2d Cir. 1985) (holding that probable cause defeats a claim for false imprisonment under New York law). As the district court stated:
 Mr. Diesel was subject to an administrative inquiry which was entirely appropriate when it first began . . . . In the context of a paramilitary organization such as the State Police, requiring Diesel's continued presence for purposes of an administrative investigation of his official conduct, which was privileged by virtue of the collective bargaining agreement, does not for most, if not all, of the time that Mr. Diesel was being questioned, rise to the level of unreasonable seizure or false imprisonment.
 
 
 [9]
 The failure of a plaintiff's Fourth and Fourteenth Amendment claims does not necessarily doom a related First Amendment retaliatory harassment claim. Diesel's claims, however, are barely distinguishable from one another, and they fail together.
 
 
 [10]
 There is some question as to whether by accepting the remittitur Diesel has waived his right to appeal the district court's damages decisions. We need not reach this issue because (i) the defendants-appellees did not object to Diesel's appeal on this ground, see Norton v. Sam's Club, Inc., 145 F.3d 114, 117 (2d Cir. 1998), and (ii) the issues raised in the cross-appeal are for the most part either mooted by our resolution of the direct appeal or without merit.