**LNC INVESTMENTS, INC. and Chapter National Life Insurance Co., Insurance Co., Plaintiffs,**

v.

**FIRST FIDELITY BANK, National Association, New Jersey, United Jersey Bank and National Westminster Bank, N.J., Defendants.**

No. 92 Civ. 7584(CSH).

United States District Court,
S.D. New York.

Jan. 25, 2001.

Butler, Fitzgerald & Potter (Raymond Fitzgerald, David McCarthy, of counsel), New York City, for Plaintiffs.

McCarter & English, LLP, (Seth T. Taube, Richard W. Hill, Steven A. Beckelman, David J. Adler, Joseph T. Boccassini, of counsel), Newark, NJ, for Defendant First Fidelity Bank.

Pollack & Kaminsky (Daniel A. Pollack, Martin I. Kaminsky, Edward T. McDermott, of counsel), New York City, for Defendants United Jersey Bank and Westminster Bank, N.J.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Following a jury verdict in defendants' favor on the issue of liability, plaintiffs move for judgment as a matter of law ("JMOL") under Rule 50(b), Fed.R.Civ.P., or in the alternative for a new trial under Rule 59.

### I. PROCEDURAL HISTORY

Plaintiffs-movants LNC Investments, Inc. ("LNC") and Charter National Life Insurance Company (collectively "the Bondholders") brought this action for breach of fiduciary duty, breach of contract, and violation of § 315(c) of the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. § 77ooo(c), against defendants First Fidelity Bank, N.A. New Jersey ("First Fidelity"), United Jersey Bank, and National Westminster Bank (collectively "the Trustees."). The Bondholders own bonds that were issued by a trust administered by the Trustees. The bonds were secured by aircraft that the trust purchased from Eastern Air Lines, Inc. ("Eastern") and leased back to Eastern pursuant to a sale/leaseback transaction. In March 1989, Eastern filed for bankruptcy, while still in possession of the aircraft. The Bondholders alleged that as a result of the Trustees' actions and lack of action throughout Eastern's bankruptcy, they will not receive all the principal and interest to which they are entitled under the bonds. The Bondholders sued to hold the Trustees liable for any shortfall.

After extensive motion practice, the case was tried for the first time before Judge Mukasey and a jury. Judge Mukasey bifurcated the trial between liability and damages issues. The jury returned a verdict in the Trustees' favor on liability. Judge Mukasey entered judgment dismissing the complaint. The Bondholders appealed. The Second Circuit reversed and remanded for a new trial, in an opinion reported at 173 F.3d 454 (2d Cir.1999), familiarity with which is assumed. The case was reassigned to this Court. The second trial, also to a jury, took place last September.

In its opinion reversing the original judgment, the court of appeals held that the district court had erred in its charge to the jury by posing as a factual issue a question of bankruptcy law that the district court should have decided as a matter of law. That question turned upon the proper interpretation of § 507(b) of the Bankruptcy Code, 11 U.S.C. § 507(b). Specifically, the question was whether the bankruptcy court's denial of a lift stay/adequate protection motion by the Trustees on behalf of the Bondholders would have conferred superpriority status upon the Bondholders' claims. The court of appeals said on that point: "Because the superpriority instruction required the jury to decide this legal question in order to resolve the causation issue, it failed adequately to inform the jury on the law. On remand, the district court should therefore decide the issue and determine what type of charge on superpriority and causation is appropriate in light of any factual disputes remaining in the new trial." 173 F.3d at 468 (citation, internal quotation marks and footnote omitted).

The second trial, like the first, was preceded by a plethora of motions. I will list the citations to this Court's opinions resolving those motions in the chronological order in which they were rendered: 247 B.R. 38, dated March 31, 2000, as amended April 11, 2000 ("*LNC I*"); 2000 WL 375236, dated April 11, 2000 ("*LNC II*");

unreported opinion dated April 12, 2000 ("*LNC III*"); 2000 WL 422399, dated April 12, 2000 ("*LNC IV*"); 2000 WL 381425, dated April 14, 2000 ("*LNC V*"); 2000 WL 461612, dated April 18, 2000 ("*LNC VI*"); 2000 WL 1024717, dated July 25, 2000 ("*LNC VII*"); 2000 WL 1072460, dated August 3, 2000 ("*LNC VIII*"); 2000 WL 1093012, dated August 4, 2000 ("*LNC IX*"); 2000 WL 1118898, dated August 8, 2000 ("*LNC X*"); 2000 WL 1182772, dated August 21, 2000 ("*LNC XI*"); 2000 WL 1211584, dated August 24, 2000 ("*LNC XII*"); unreported opinion dated September 7, 2000 ("*LNC XIII*"); 2000 WL 1290746, dated September 11, 2000 ("*LNC XIV*"); and 2000 WL 1290615, dated September 12, 2000 ("*LNC XV*"). Familiarity with all these opinions is assumed. I will have occasion to refer to some of them in this Opinion.

In *LNC I*, following further briefing and oral argument, I answered in the negative the bankruptcy law question identified by the court of appeals in its opinion remanding the case for a new trial. Specifically, I held that where a bankruptcy court denied a secured creditor's lift stay/adequate protection motion and the existing security subsequently proved inadequate, that denial did not *ipso facto* confer superpriority status upon the secured creditor's claim. In *LNC VI* I denied the Bondholders' motion for reconsideration of that holding and adhered to it. Because I regarded my holding in *LNC I* as a controlling question of law for the second trial, as to which there was a substantial ground for difference of opinion (there is no Second Circuit authority on the point), in *LNC VI* I also certified the question for interlocutory appeal under 28 U.S.C. § 1292(b). But the court of appeals declined to accept the certification, and so the second trial proceeded.

## II. THE TRIAL

As did Judge Mukasey at the first trial, I bifurcated the second trial between is-

782

sues of liability and damages, giving my reasons in *LNC IV*.

On liability the Bondholders principally contended that the Trustees acted imprudently by not making a lift stay/adequate protection motion in the Eastern bankruptcy case before November 14, 1990, the date on which such motion was made. The Trustees denied any imprudent conduct.

Following the completion of the evidence, the closing arguments of counsel, and the Court's charge, a special verdict form was utilized to submit the case to the jury. Counsel were given an opportunity to consider the special verdict form. No objection was made to it.

Question I on the form asked if the plaintiffs had proved "that a defendant or defendants acted imprudently by not making a lift stay/adequate protection motion before November 14, 1990." The jury was directed to answer that question "Yes" or "No" separately with respect to each of the three defendant Trustees. The special verdict form contained an instruction that if the jurors answered "No" with respect to each of the three defendants, they were to answer no further questions and sign their names to the form.

If the jury in answering Question 1 had found that any defendant had acted imprudently, Question 2 directed the jury to specify by month and year the date by which "the prudent man standard required that a lift stay/adequate protection motion be made."

Question 3 asked the jury whether plaintiffs "proved by a preponderance of the evidence that the imprudent conduct of a defendant or defendants proximately caused an economic loss to plaintiffs," and directed the jury to answer "Yes" or "No." The special verdict form did not ask this jury to calculate a specific amount of damages, because as noted the trial had been bifurcated. Question 3 focused upon the more general issue of a proximate causal connection between the Trustees' conduct and any economic loss suffered by the Bondholders.

Questions 4 and 5 asked the jury whether the defendants had proved by a preponderance of the evidence that the plaintiffs had waived their claim against the defendants or ratified any imprudence of the defendants. The Trustees had pleaded, among others, the affirmative defenses of waiver and ratification, and submitted some evidence in support of those defenses, as to which they bore the burden of proof.

The jury answered "No" to Question 1 with respect to each of the three defendant Trustees. In compliance with the special verdict form's instruction, the jurors answered no further questions. Because the jury held against the Bondholders and in favor of the Trustees on the issue of liability, the Court entered judgment dismissing the complaint with prejudice. The Bondholders timely filed the present motions, which the Trustees oppose.

## III. THE MOTION FOR A JMOL

The Bondholders move for judgment as a matter of law, contending that "the only conclusion a reasonable juror could reach on the evidence is that the defendants were imprudent in waiting until November 14, 1990 to make a lift stay/adequate protection motion." Main Brief at 1. They argue that notwithstanding the Trustees' assertions of prudence, "there really was no genuine dispute that, given the undisputed relevant and credible evidence as to the likely outcome of a motion and the risk involved in waiting to move, it was imprudent to wait until November 14, 1990 to make the motion." *Id.*

This motion for a JMOL is made under Rule 50. Rule 50(a)(2) provides:

Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on

which the moving party is entitled to the judgment.

Those provisions are immediately followed by Rule 50(b), upon which the Bondholders particularly rely. Rule 50(b) provides in pertinent part:

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59.

### A. The Standards of Review

In the recent case of *Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000), the Second Circuit summarized the standards applying to a motion for judgment as a matter of law:

"We review de novo a district court's resolution of a motion for judgment as a matter of law, and we apply the same standard as the district court itself was required to apply. In ruling on a motion for judgment as a matter of law, we must therefore consider the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences from the evidence that the jury might have drawn in that party's favor. We cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury. The motion may be granted only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against the moving party."

(citations and internal quotation marks omitted).

 *Diesel* is only the latest decision in an unbroken line of Second Circuit authority. "The same standard that applies to a pretrial motion for summary judgment pursuant to Fed.R.Civ.P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50." *Alfaro v. Wal–Mart Stores, Inc.,* 210 F.3d 111, 114 (2d Cir.2000) (citation and internal quotation marks omitted). That exacting standard for a JMOL requires the moving party to show that "viewing the evidence in the light most favorable" to the nonmoving party, and giving that party "the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence," the moving party "is nevertheless entitled to judgment as a matter of law." *Id.* In *This is Me, Inc. v. Taylor,* 157 F.3d 139, 142 (2d Cir.1998), the Second Circuit cautioned that

[a] district court may not grant a motion for a judgment as a matter of law unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable persons could have reached. Weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that a reasonable juror would have been compelled to accept the view of the moving party.

(citations and internal quotation marks omitted). A JMOL cannot be granted "[i]f, drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor." *Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1039 (2d Cir.1992).

### B. Preliminary Points for Consideration

Before considering the merits of the Bondholders' Rule 50(b) motion, two preliminary points must be addressed.

■ The first point is a possible procedural impediment to the Bondholders' motion. After all parties rested, I read into the record the texts of Rules 50(a)(2) and 50(b) and said that "I will entertain any motions that may arise now at the close of all the evidence," Tr.2048. Counsel for the Bondholders limited his Rule 50(a)(2) motions to the Trustees' affirmative defenses of champerty, estoppel, waiver, and ratification. Tr.2050–2053. Counsel for the Trustees withdrew the defense of champerty. Tr.2050. After further argument, I granted the Bondholders' motion for a JMOL on the affirmative defense of estoppel, but declined to grant their motion "at this time on the affirmative defenses of waiver and ratification," Tr.2063, thereafter submitting those defenses to the jury as Questions 4 and 5 on the special verdict form.

The procedural point arises from the fact that counsel for the Bondholders made no reference in his Rule 50(a)(2) motion at the close of the evidence to the issue upon which they now seek a JMOL under Rule 50(b), namely, the imprudence of the Trustees' conduct. The Second Circuit has said that "judgment as a matter of law is limited to those issues specifically raised in a prior motion for a directed verdict," and that "a motion for directed verdict at the close of all the evidence is a prerequisite for judgment as a matter of law." *Cruz v. Local Union Number 3*, 34 F.3d 1148, 1155 (2d Cir.1994) (citations and internal quotation marks omitted).[1] The *Cruz* court added that "this procedural requirement may not be waived as a mere technicality," so that "if an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is required to prevent manifest injustice." *Id.* (citation and internal quotation marks omitted). According to

a leading treatise, "[t]he requirement in Rule 50(a)(2) that grounds be stated on a motion for judgment as a matter of law before submission is mandatory.... The statement of one ground precludes a party from claiming later that the motion should have been granted on a different ground." 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2533 (West 2d ed.1995).

Therefore it is at least arguable that the Bondholders, having failed to move under Rule 50(a)(2) at the close of the evidence for a JMOL on the issue of the Trustees' prudence, cannot do so now under Rule 50(b). However, the Trustees have not urged that procedural objection in their papers, opting instead to oppose the Bondholders' motion on the merits; and, notwithstanding the strictures in the authorities just quoted, other Second Circuit cases appear to stand for the proposition that the non-moving party's failure to object constitutes a waiver. *See Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 87 (2d Cir.1998) ("when the party moving for JMOL fails to articulate its motion with sufficient specificity, the non-moving party must object in order to preserve the issue for appeal."); *Gibeau v. Nellis*, 18 F.3d 107, 109 (2d Cir.1994) (noting that appellants failed to properly renew their motion for JMOL at the close of all the evidence, but holding that "because appellees failed to raise this procedural defense in the district court, they are the ones who have waived the issue" on appeal).

There would appear to be some tension between these two lines of Second Circuit authority. On an eventual appeal in this case, the Trustees may be moved to assert in the court of appeals this procedural defense against any renewed effort by the Bondholders to obtain a JMOL on the issue of prudence. But I think the better

1. The references in the *Cruz* opinion, quoted in text, to "a directed verdict" are anachronistic. As the Advisory Committee's Notes to the 1991 amendment to Rule 50(a) make clear, "[t]he revision abandons the familiar terminology of *direction of verdict....* If a motion is denominated a motion for a directed verdict or for judgment notwithstanding the verdict, the party's error is merely formal. Such a motion should be treated as a motion for judgment as a matter of law in accordance with this rule."

course for me to follow is to consider the motion on its merits.

The second preliminary point arises from the Bondholders' inclusion in the brief supporting their Rule 50(b) JMOL motion a litany of separate complaints concerning the Court's evidentiary rulings, *in limine* or at trial. The Bondholders assert that I erroneously excluded some of their proffered evidence and erroneously admitted some of the Trustees' evidence.

■ A disappointed litigant may raise such evidentiary issues in support of a motion for a new trial under Rule 59 (and indeed, the Bondholders include each separate assertion in the portions of their brief supporting their alternative Rule 59 motion), or on direct appeal, in which event the court of appeals will consider whether the trial court's evidentiary rulings constituted reversible error. But it is inherent in the standards which govern the granting or denial of a Rule 50(b) JMOL motion that the motion must be determined on the basis of the evidence the trial judge admitted and the jury considered. It is the record made at trial, consistent with the trial judge's evidentiary rulings, to which one must look in evaluating whether a rational jury could have arrived at the verdict reached. Conceptually, one may allow the possibility that the jury was deprived of evidence it should have heard or seen, or that it heard or saw evidence that it should not have. As noted, these perceived wrongs may be complained of by means of other procedural vehicles, but they can play no part in determining whether, on the record actually made, the Bondholders are entitled to judgment as a matter of law. Accordingly I say nothing further about these evidentiary issues in this Part of the Opinion. I will consider them *seriatim* in subsequent Parts.

## C. *The Merits of the Bondholders' JMOL Motion*

■ Having dealt with these preliminary considerations, I turn to the merits of the Bondholders' motion for a JMOL. The discussion need not be extended. The motion has no merit.

I have quoted the assertion in the Bondholders' brief that "there really was no genuine dispute" that the Trustees acted imprudently in their timing of a lift stay/adequate protection motion. I prefer not to characterize that astonishing claim as disingenuous; let it be ascribed instead to a determined and able advocate's ability to persuade himself of the rectitude of his cause. But the fact of the matter is that the Trustees strenuously disputed the Bondholders' charge of imprudent conduct, and summoned a host of witnesses in their defense.

Thus the officers in charge of the matter at the three defendant banks explained why they had not made a motion at an earlier time. The bankruptcy attorneys who advised the Trustees explained why they had not recommended that their clients make an earlier motion. A principal concern expressed by these witnesses arose from the fact that as certain of the Eastern fleet of aircraft were sold with bankruptcy court approval, millions of dollars in cash replaced the sold aircraft as collateral for the Bondholders. This seemingly neutral economic development generated concern because the Trustees and their legal advisers perceived Bankruptcy Judge Lifland, who was presiding over the Eastern bankruptcy, to be a jurist determined to keep Eastern in business if at all possible (it eventually proved impossible). Those circumstances gave rise to the perceived risk that an earlier lift stay/adequate protection motion by the Trustees, at a time when there were many collateralized aircraft still being operated by Eastern and also large sums in the cash collateral pool, might have prompted Eastern to cross-move—and Judge Lifland to direct— that a part of that cash be released to Eastern for operating expenses.

Given this state of the record, counsel for two of the Trustees was in a position to argue to the jury at the end of the case:

The trustees, as the evidence showed repetitively, were concerned that, since they were so heavily collateralized and had this big equity cushion, that Judge Lifland would say: Wait a minute, Eastern Air Lines is in need of cash, they are burning cash at a very rapid rate, you are overcollateralized. I am giving back some of that collateral for operating purposes. It may have been right, it may have been wrong, but it was an intelligent, legitimate concern by people conservatively watching the money of other people. They would have been foolish to do what Mr. Fleming [an expert witness called by plaintiffs] said: Make the motion, if you lose, make it again.

Tr. 2154.

At trial the Bondholders challenged this defense and the other reasons given by the Trustees for the timing of their eventual motion. The Bondholders relied upon the perceived admissions that their counsel claimed to have extracted from the bank officers called as adverse witnesses, and from the bankruptcy attorneys who advised the Trustees. The Bondholders also called expert witnesses who supported the charge that the Trustees had delayed imprudently. All these efforts of advocacy were legitimate. The jurors, who received the routine instructions that they were to consider the entire testimony of any witness, on direct and on cross-examination, and were free to accept or reject the opinions of expert witnesses, were entitled in law to be persuaded by the Bondholders' evidence and arguments. But the jurors were equally entitled in law to reject the Bondholders' evidence and arguments; and the Bondholders' failure to persuade the jury is manifested by the jurors' answering the first question in the special verdict form in the negative. The issue of the Trustees' prudence *vel non* was for the jury, which on conflicting evidence resolved the issue against the Bondholders. In the light of the Second Circuit authority discussed *supra*, it is quite impossible to say on this record that no rational jury could have reached that result. Accordingly the Bondholders' motion for a JMOL fails.

It is necessary only to add two brief points. Ostensibly in support of their Rule 50(b) motion, the Bondholders contend in their Main Brief at 7 that this Court's "ruling in its March 31, 2000 Decision and Order elevates form over substance." That is a reference to my decision in *LNC I* on the Bankruptcy Code § 507(b) superpriority issue, adverse to the Bondholders' interests, which as noted the Second Circuit declined to consider on interlocutory appeal. The Bondholders may of course raise the point on direct appeal, but it is not relevant to an evaluation of their Rule 50(b) motion for a JMOL. The same lack of relevance to that motion applies to the Bondholders' reiterated objection to the Court's charge on the superpriority question. The record reflects my reasons for the charge given and the Bondholders' objection to it, *see* Tr.2072–2073, so the point is preserved for appeal; but the correctness *vel non* of that instruction has nothing to do with Rule 50(b) analysis.

For the foregoing reasons, the plaintiffs' motion for judgment as a matter of law is denied.

## IV. THE MOTION FOR A NEW TRIAL

Alternatively, the Bondholders move for a new trial pursuant to Rule 59. Rule 59(a) provides:

A new trial may be granted ... for any of the reasons for which new trials have been granted in actions at law in the courts of the United States.

Each of the Bondholders' four asserted reasons for a new trial arise out of the Court's evidentiary rulings, either *in limine* or during the trial. Specifically, the Bondholders argue that they are entitled to a new trial

\* "in which they are permitted to introduce evidence of First Fidelity's own lift

stay/adequate protection motion" (Main Brief, Point II);

* "because evidence should not have been permitted on the untenable defenses of waiver and ratification" (*id.*, Point III);

* "in which defendants are not permitted to introduce evidence of oral advice of counsel and the jury is instructed that defendants were only entitled to rely on written advice of counsel" (*id.*, Point IV); and

* "in which defendants are not permitted to offer evidence of appraisal values of which they never became aware" (*id.*, Point V).

## A. *Standard of Review*

■ A trial judge's erroneous evidentiary rulings may furnish a basis for granting a post-verdict motion for a new trial under Rule 59. In its discussion of Rule 59, 12 *Moore's Federal Practice* (Matthew Bender 3d ed.) says at § 59.13[2][b][E] at pp. 59–46–47:

> The improper admission of evidence at trial may warrant the grant of a motion for new trial, particularly when the evidence improperly admitted is found to be prejudicial. Further, a court's failure to admit highly probative evidence that is likely to have a profound impact on the outcome of the trial may also be grounds for a new trial.

(footnotes omitted). Moore's Treatise then adds at p. 59–47: "For a thorough discussion about the standards for reviewing erroneous rulings that admit or exclude evidence, see *Weinstein's Federal Evidence*, Ch. 103, *Rulings on Evidence* (Matthew Bender 2d ed.)."

The Weinstein Treatise discusses in Chapter 103 the workings of Rule 103 of the Federal Rules of Evidence. Thus it is the view of the Moore Treatise (which I share) that Rule 103, F.R.Evid., sets the standard for evaluating whether a trial court's evidentiary errors are sufficient to justify a new trial under Rule 59,

F.R.Civ.P. And in that regard, Rule 103(a) provides:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . .

The Weinstein Treatise expands upon that concept:

> Thus, no evidentiary ruling constitutes reversible error unless it affects a substantial right of a party. A ruling that affects a substantial right is not a basis for reversal, however, unless the ruling is erroneous.

1 *Weinstein's Federal Evidence* § 103.41[1] pp. 103–47–48.1 (Matthew Bender 2d ed.). Second Circuit case law applies these standards. *See, e.g., Monarch Insurance Company of Ohio v. Insurance Corporation of Ireland Ltd.*, 835 F.2d 32, 35 (2d Cir.1987) ("In any event, error may be predicated upon a ruling which excludes evidence only where 'a substantial right of the party is affected. . . .' In view of the absence of any evidence of damage to ICI, no such showing was made here.") (quoting Rule 103(a); other citations omitted). Another leading treatise is in accord:

> Claims of error with regard to the admission or exclusion of evidence are prime candidates for application of the harmless error rule. . . . Whether a 'substantial right' has been invaded is dependent on the circumstances of the case, and the proceedings will not be disturbed, on post-trial motion in the district court or on appeal, unless any error of the court was truly harmful.

11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2885 pp. 453–54 (West 2d ed.1995) (footnotes omitted).

The application of those standards to the case at bar requires the Bondholders to show that this Court's specified evidentiary rulings, viewed separately or together, were (a) erroneous and (b) adversely affected a substantial litigation right of the

Bondholders, so that the rulings were "truly harmful" to the Bondholders. I will consider the several asserted evidentiary errors in the order in which the Bondholders advance them.

### B. Evidence Concerning First Fidelity's Protective Motion

■ The Bondholders argue that they are entitled to a new trial in which they would be permitted to introduce evidence of a protective motion that First Fidelity made on March 23, 1989 in the Eastern bankruptcy proceedings. The present argument has two prongs. First, the Bondholders reiterate contentions which the Court twice rejected in *in limine* rulings. Second, they contend that trial testimony given a First Fidelity officer "opened the door" to that evidence the *in limine* rulings had excluded, a contention that the Court rejected during the trial.

The Bondholders sought to place before the jury evidence of a protective motion that First Fidelity made on its own behalf in the Eastern bankruptcy proceeding prior to the motion that First Fidelity and the other Trustees eventually made on the Bondholders' behalf. Such evidence, had it been received, would have shown the following: prior to Eastern's bankruptcy filing in March 1989, Eastern maintained funds on deposit in several accounts with First Fidelity and its affiliated banks; in September 1987, on Eastern's instructions, First Fidelity issued an irrevocable standby letter of credit for $7,800,000 in favor of Eastern's insurer as beneficiary; the Eastern accounts with First Fidelity collateralized First Fidelity's obligation to the letter of credit beneficiary; on March 9, 1989, Eastern filed its Chapter 11 bankruptcy petition; in a letter dated March 16, 1989, Eastern demanded that First Fidelity close out the Eastern accounts and return all the monies on deposit to Eastern; with the letter of credit still outstanding, First Fidelity refused to return Eastern's deposits; and on March 23, 1989, First Fidelity filed in the bankruptcy court a motion captioned as one "for relief from stay to allow retention of deposits and setoff."

### 1. The In Limine Rulings

The Bondholders argue on the present motion that "First Fidelity's own motion is probative of the question of the prudence of waiting to make a lift stay/adequate protection motion on behalf of the Trust because when First Fidelity made its own lift stay/adequate protection motion, First Fidelity was in the same position the Trust was in—it was a secured creditor with collateral that it wanted to adequately protect." Main Brief at 10.

The Bondholders made the same argument in opposing First Fidelity's motion *in limine* to exclude this evidence. In *LNC VIII* I granted First Fidelity's motion and excluded the evidence. The Bondholders moved for reconsideration. In *LNC XIV* I denied the Bondholders' motion and adhered to the initial ruling. The reader's familiarity with those opinions is assumed. I remain of the view that the rulings were correct and see no need to restate their reasoning.

### 2. Trial Testimony and the "Open Door" Theory

As a second prong on their argument for the admissibility of this evidence, the Bondholders say that "the precluded evidence regarding First Fidelity's own lift stay/adequate protection motion would have impeached testimony of First Fidelity's only witness and would have undermined one of the excuses that First Fidelity raised for not making a motion on behalf of the Trust." Main Brief at 14. The latter of these two assertions is said to support the Bondholders' assertion that the trial testimony of a First Fidelity witness "opened the door" to the previously excluded evidence.

The witness in question was Peter Chiste, at the pertinent times the corporate trust officer at First Fidelity in charge of directing First Fidelity's conduct as a collateral Trustee under the Eastern trust indenture whose certificates the

Bondholders purchased. According to the Bondholders' new trial motion, "Mr. Chiste testified that a factor considered when choosing not to move earlier was the purported fact that secured creditors did not fare well in the Eastern bankruptcy." Main Brief at 14 (citing to the Trial Transcript at 1274). But Chiste was aware, the argument continues, "that First Fidelity had fared quite well on its own lift stay/adequate protection motion," which leads the Bondholders to conclude that "[h]ad the jury heard such evidence it likely would have doubted Mr. Chiste's credibility, or at the least would have rejected the substance of his excuse." *Id.*

In point of fact, Chiste's testimony as a vehicle or "door" for the admission of the previously excluded evidence generated a considerable amount of colloquy at the trial. The Bondholders' main brief on their motion for a new trial singles out and isolates one answer Chiste gave during his trial testimony. However, a more extended analysis of Chiste's testimony and the contentions counsel made at that time is necessary to place the Bondholders' present motion in context.

Counsel for Bondholders called Chiste as an adverse witness on their case in chief. After Mr. Fitzgerald, counsel for plaintiffs, completed his "direct" examination of Chiste, counsel for First Fidelity, Mr. Taube, conducted a "cross" examination. Given the circumstances of Chiste's appearance as a witness, the adjectives "direct" and "cross" are of course misnomers.

The questions and answers which counsel for the Bondholders contended at trial "opened the door" to evidence concerning First Fidelity's conduct in the letter of credit context related to the perceived judicial proclivities, tendencies, and preferences of Bankruptcy Judge Burton Lifland, who presided over the Eastern Airlines Chapter 11 proceeding. That subject was first introduced by counsel for the series Trustees, defendants UJB and NatWest, who in cross-examining Professor James T. White, an expert witness on bankruptcy law called by the Bondholders, elicited this testimony:

Q. Judge Lifland is a strongly pro-debtor judge by reputation, is he not?

A. Yes, he is.

Q. And by pro-debtor, you mean pro-organization, does it not?

A. It does.

Q. Wanted to keep Eastern Air Lines flying?

A. Correct.

Tr. 433.

Under questioning by counsel for First Fidelity, Chiste testified as follows:

Q. Did you consider what effect it would have on the collateral ratio of being able to sell these aircraft at above appraised value in many of these sales? How would that affect the ratio?

A. It would have the impact of increasing the collateral ratio.

Q. That you were more secure?

A. Yes.

Q. How would that impact your ability to convince Judge Lifland that you needed more protection in that period of time?

A. It wouldn't help us if we were seeking that in a motion.

Tr. 1234.

\* \* \* \* \* \*

Q. What would that do to the cash you have in escrow?

A. It would put the cash we had in escrow in jeopardy of Eastern making argument that we were overcollateralized beyond the collateral ratio and they could then seek to use that cash.

Tr. 1241.

\* \* \* \* \* \*

Q. Did you perceive at that time any risks in going into court and seeking adequate protection where you could

come out with less than you went in with?

A. Yes, we always had that perception that there was a potential, since we were still in an overcollateralized position, that Eastern could make argument that some of that collateral could be released for their use and we would end up losing collateral. We might end up going into court and coming out with a result that was detrimental to the certificate holders.

Q. Was there a reason why making the motion for adequate protection would put your cash at risk more than Eastern just moving itself independently at some other time?

A. Well, for us to make the adequate protection motion, we would have to be providing the appraisal as well, and at that time the best appraisal we had was a fair market value appraisal which showed we were overcollateralized.

Q. So the appraisal, in making the motion, would give Eastern the opportunity to argue from your own evidence you had too much collateral?

A. It was providing them the ammunition in addition to make a request that some of that cash collateral could be released.

Tr. 1246.

\* \* \* \* \* \*

Q. Going back to the top of the page, could you read for the jury what that paragraph says that starts "Eastern wants to raid"—

A. It reads: "Eastern wants to raid $50 million of the unsecured escrow—this would include interest earnings on secured escrow segregated account. Motion scheduled 3/1/90. Eastern did not give Riker Danzig notice of the hearing or motion."

Q. What significance did it have to you, putting aside the issue that's referenced here on the interest, which was the interest we just talked about, what is this reference about rating [sic; should read

"raiding"] $50 million of unsecured escrow? What is that about?

A. What this is about, there were also escrow accounts that were being maintained by Eastern for the unsecured creditors, a different creditor constituency than our secured creditor. And this note indicates that Eastern was now in a position where it was seeking to utilize some of those escrow cash out of that unsecured escrow account.

Q. Did this have any influence on you in considering what Eastern would do if you went into court and moved for adequate protection?

A. Yes.

Q. What influence did it have in your decision-making process?

A. This was an indication that Eastern was in need of cash to continue with its operations, and we were concerned that if they were going after the unsecured's cash, that potentially the case that was being held for our secured creditors would be next.

Q. So, in February of 1990, you reviewed this and it influenced, in the winter and spring of 1990, your decision on whether that was an opportune time to go in and ask for more?

A. Yes, it probably did.

Tr. 1253–1254.

Q. In 1989 or 1990, were you aware of anything Judge Lifland had said in court which influenced your views or judgment on Eastern's likelihood of being able to get some of your cash if you made a motion for adequate protection prior to the fall of '90?

A. Yes.

\* \* \* \* \* \*

MR. TAUBE: I will clarify.

Q. Mr. Chiste, did you have an understanding from your counsel, Mr. O'Grady, that Judge Lifland had said something concerning the use—withdrawn.

Turn to Exhibit EB in evidence. We will make it simple. Is this the tran-

script of that hearing on June 14 that was previously put in evidence?

A. Yes.

Q. Did you read this transcript at sometime shortly after it was heard?

A. I believe so.

Q. There is a reference on page 40 to Mr. Zirinsky talking. Who is Mr. Zirinsky?

A. Mr. Zirinsky was one of the attorneys from Weil Gotshal representing Eastern Air Lines.

Q. Mr. Zirinsky said at the time—withdrawn. Did you read at the time on page 41:

"I don't think there is any dispute that debt is more than amply fully secured and there is no reason, given Eastern's cash position and the amounts held in escrow from that debt, that the interest could not be paid at this time."

Did you read that at the time?

A. Yes.

Q. An that on the next page, on page 42, Mr. Zirinsky talks about "all parties reserving their rights with respect to those proceeds as to whether the trustees are entitled to two-thirds, one-third, or whatever amount that may be and Eastern reserves its right."

Do you see that, sir?

A. Yes.

Q. What was your understanding as to what Eastern was reserving its right to argue?

A. That they were entitled to one-third of the proceeds from assets.

Q. Even after the occurrence of the bankruptcy?

A. Yes.

Q. Did you read right after that the judge responded: "How did you come to such nice, simple, contemplative numbers like one-third, two-thirds? I have some of my own calculations, and it doesn't work out quite that simply as to each of the two different pools." Then Mr. O'Grady goes on at the bottom ex-

plaining: "The one-third, two thirds split of the indenture," to which the judge replies on page 43:

"All right, that's interesting, because I backed into those figures on an entirely different concept which related to the evaluation of the collateral, the entire collateral pool and the relationship of that with respect to the assets that are being sold. So that may be a pure coincidence, I come out close to the same numbers."

Was he referring to, in your understanding, the one-third, two-thirds split?

A. That was my understanding, yes.

Q. Did you discuss these two sentences from the judge that he uttered that day? Did Mr. O'Grady discuss with you what his view of what that language meant?

A. Yes, I believe so.

Q. What do you recall him saying to you as to the implication of the judge talking about one-third, two-thirds?

A. The implication was that there was a possibility the judge would take the position that on these asset sales one-third could be reserved for use by Eastern.

Q. Did that play a consideration in your judgment and those of other trustees with whom you spoke at the time as to the risks of going in with an appraisal and saying, "I want more, I want adequate protection"?

A. Yes it did, because it was another indication that our cash collateral was subject to attack by Eastern.

Q. Even though, under the technical terms of the indenture, post-default you should have had 100 percent?

A. Yes.

Tr. 1254, 1256–1259.

Q. Turn to tab—I apologize for flipping around—tab 1063. What is that document?

A. This is the order fixing the date for the motion of the sale of one aircraft to

Cathay Pacific Airways, one of the L-1011s.

Q. On page 6595, what was the contract price of that sale in March of 1989?

A. 15.9 million.

Q. You see there is a reference directly above that 15.9 to the tail number of 372 EA. Do you see that?

A. Yes.

Q. Exhibit 34 shows that tail number 372 was worth, was appraised at 14.7 million, and yet it was sold at contract price of 15.9 million. Do you see that, sir?

A. Yes.

Q. You testified that there were some adjustments due to maintenance in that sale?

A. Right.

Q. However, in determining how the market would value these aircraft, did you look at the contract price or the adjustment price?

A. The contract price.

Q. Was the contract price in the spring of 1990 on this aircraft more than a million dollars above appraised value?

A. Yes, it was.

Q. Did that give you any comfort in the spring of 1990 as to whether the values of your pool were still holding up?

A. Yes, it did.

Q. This actual sale?

A. Yes.

Q. Did that aid you in any way in determining what success you would have had in arguing before Judge Lifland that you were losing collateral values and that you needed more protection?

A. We would be hard-pressed to be making that argument in an adequate protection motion.

Tr. 1262–1263.

* * * * * *

Q. So did you have a view at the time, therefore, what Judge Lifland would have done if you had gone into court the weekend after Mr. Shugrue is appointed and say, I want to see maintenance logs, I want to see airplanes, I need to do a physical appraisal, what would the judge have done?

A. We didn't think we had a good likelihood of success on that motion.

Tr. 1265.

* * * * * *

Q. When Eastern opposed a motion by a creditor, generally, what was your observation over that year-and-a-half period?

A. Generally, that he would not side with the creditor.

Q. And that affected your view as to whether Judge Lifland prior to the Gulf invasion and the events of the fall would have agreed to give you more, give you adequate protection if you had gone in against Eastern's wishes?

A. Yes, it was a factor in our decision-making process.

Tr. 1274.

Immediately following this testimony, and before commencing his own "re-direct" examination of Chiste, counsel for the Bondholders argued at the sidebar:

I think they have opened the door to First Fidelity's own adequate protection motion. This man testified, in response to his question, that when Eastern opposed a motion made by a creditor, Judge Lifland sided with the creditors. In this case they made a motion for adequate protection, there was opposition to it, and what eventually happened was it was worked out, which is what we say would have happened in this particular case, and Judge Lifland sided with the creditor and gave them adequate protection.

Tr. 1287.

Counsel's submission came toward the end of the trial day, September 20. I directed Chiste to remain overnight (he was preparing to go home), and heard oral

argument on the issue before the jury arrived on the morning of September 21.

At that time Mr. Fitzgerald, counsel for the Bondholders, argued that Mr. Taube, representing First Fidelity, "intentionally elicited from the witness [Chiste] that witness's perception of what Judge Lifland would do, and that was repeatedly, what Eastern would do, and what they would do in connection with an adequate protection motion." Tr. 1317. Therefore it followed, Mr. Fitzgerald continued, that "they [First Fidelity] have put into play the bases of this witness's perceptions of what Eastern would do and what Judge Lifland would do. Once having put into play the bases of this witness's perception, it is prejudicial to me and unfair not to let me elicit that there were other facts of which this witness was aware that should have affected his perception or at least have him address it." Tr. 1321–1322. In support of that submission, Mr. Fitzgerald cited the Second Circuit's opinion in *United States v. Panebianco,* 543 F.2d 447 (2d Cir.1976), and other cases. What those cases hold, Mr. Fitzgerald contended, is that "if a situation is created that you were going to leave the trier of fact with a false impression, then the false impression should be cleared up, and once the other side opens the door, they can't try to close it after having elicited this sort of information." Tr. 1322–1323. Mr. Fitzgerald then argued:

So I think that I am entitled to pursue this line of questioning for two reasons: First of all, it will impeach the credibility of the witness, because it will undermine his statements as to his perception, his statements as to his bases for his believes as to what Eastern would do and what Judge Lifland would do.

Second of all, I think I am entitled to it, in addition to just impeachment, because having opened the door on what would happen, what their perception of what would happen with respect to both Eastern and Judge Lifland if they made the adequate protection motion, it calls out

for introducing to the jury the specific facts occurring when they did that very thing.

Tr. 1323.

Completing his argument, Mr. Fitzgerald reiterated his contentions, previously rejected by the Court in the two prior opinions, that evidence "of how First Fidelity made decisions with respect to their money in their capacity as a secured creditor" was probative of the prudence of their conduct as indenture trustees, Tr. 1327, and concluded: "I know that you disagree with me because of jury confusion and other reasons, but they [First Fidelity] have now come and put a false impression in front of that jury. The jury doesn't know it is false yet, but they have done it, I think I have a right, subject to your Honor's ruling, to correct that false impression." *Id.*

Responding to these arguments, Mr. Taube, counsel for First Fidelity, first observed that the first witness who discussed Judge Lifland's proclivities was Professor White, a plaintiffs' expert, so that "this issue of Judge Lifland's proclivities was in the case from Mr. Fitzgerald." Tr. 1328. There is no substance to that suggestion, since White gave testimony on that point in response to cross-examination by Mr. Pollack, counsel for the other two defendant banks, and Mr. Taube's comrade in arms.

But there is substance to Mr. Taube's second point, which is based upon the undisputed facts that while First Fidelity's protective motion in the letter of credit context was initially opposed by Eastern, those parties then entered into an adequate protection stipulation. That stipulation was presented to Judge Lifland, who bestowed upon it a "so-ordered" endorsement. Accordingly Judge Lifland was not required to render a decision on a contested lift stay/adequate protection motion which Eastern as debtor-in-possession was opposing, or on a cross-motion by Eastern for release of cash collateral. .

Finally, Mr. Taube reiterated the contention that the balancing process required by Rule 403, Fed.R.Evid. required exclusion of evidence concerning First Fidelity's conduct in the letter of credit transaction. I had based the two prior opinions excluding this evidence principally upon the application of Rule 403 to the circumstances of this case.

When Chiste's testimony is considered at greater length and in context, I conclude that the exclusion of the Bondholders' proffered evidence concerning First Fidelity's protective motion, in that bank's capacity as letter of credit issuer, cannot form the basis for granting the Bondholders a new trial. Because that exclusion was not erroneous, the Bondholders do not make the first of the two necessary showings to justify a new trial based on evidentiary rulings. I conclude that the exclusion of the evidence was proper for three reasons.

First, the excluded evidence lacked relevance to the issue of the prudence of the banks' conduct *as Trustees* (the ground for admissibility the Bondholders urged in the *in limine* motions), so that the evidence was inadmissible under Rule 401 and 402, F.R.Evid., or to the extent relevant, the evidence did not pass muster under the balancing exercise Rule 403 requires the trial court to perform. Therefore I adhere to the rulings in *LNC VII* and *LNC XIV*. But it is appropriate to add that the detailed trial testimony Chiste gave with respect to the particular circumstances the banks faced as Trustees for the Bondholders, the legal advice the Trustees received, and the risks they perceived to be inherent in an earlier lift stay/adequate protection motion, all serve to reinforce the *in limine* rulings that First Fidelity's circumstances as letter of credit issuer were so different as to require exclusion of the proffered

evidence under Rules 401 and 402, or alternatively under 403.

Given Chiste's testimony, the Bondholders materially oversimplify the matter when they say that at the time First Fidelity made its own lift stay/adequate protection motion, "First Fidelity was in the same position the Trust was in," that is, a secured creditor with collateral it wished to protect. The cash on deposit in Eastern's accounts at First Fidelity, which the Bondholders view as collateralizing the letter of credit issued by First Fidelity,[2] was insignificant in amount when compared to the Trust cash collateral generated by the sale of Eastern aircraft during the bankruptcy, proceeds which eventually totaled $206.5 million. Amounts of that magnitude, when viewed together with the additional Trust collateral represented by the value of the remaining aircraft in the Eastern fleet, might well have brought a gleam to the eye of a bankruptcy judge inclined by his nature to preserve the existence of an airline imperiled by cash operating deficits. At least that was the Trustees' concern, as comprehensively articulated by Chiste in his testimony; but no comparable concerns arose in the context of the letter of credit.

The very best that could be said for the proffered evidence on the issue of the Trustees' prudence was that the promptness with which First Fidelity made its own protective motion in the letter of credit context formed the basis for inferring that the Trustees' delay in moving on behalf of the Trust was imprudent. However, the differing circumstances, described prior to trial in *LNC VII* and *LNC XIV*, and post-trial in the preceding paragraphs of this Opinion, demonstrate that any minimal relevance First Fidelity's earlier conduct might have to the prudence of the

**2.** Eastern did not concede at the time that its funds on deposit at First Fidelity "constituted collateral in which First Fidelity had a perfected security interest." *LNC XIV*, 2000 WL 1290746 at *2. On the contrary, Eastern's papers opposing First Fidelity's protective

motion explicitly declined to concede the point. *Id.* Thereafter Eastern entered into a stipulation with First Fidelity which made it unnecessary for Bankruptcy Judge Lifland to consider the issues.

timing of the Trustees' eventual motion on behalf of the Trust would be "substantially outweighed," in the wording of Rule 403, by a number of the considerations that Rule cautions against.

If the Bondholders had been permitted to prove the fact of First Fidelity's protective motion in the letter of credit context, then in fairness First Fidelity would have been entitled to prove the full circumstances of that transaction in order to rebut the invidious comparison the Bondholders were seeking to draw. As noted, those circumstances included Eastern's reservation of the right to argue that its cash deposits did not confer upon First Fidelity the status of a pre-petition secured creditor under § 363 of the Bankruptcy Code: an argument that was not available to Eastern in respect of the Trust collateral. Given its prior opinion in the case, one supposes that the Second Circuit would have regarded this question as one of law for decision by the trial court, thereafter to be built into appropriate instructions to the jury. The circumstances surrounding the letter of credit transaction also included Eastern's willingness to enter into an adequate protection stipulation with First Fidelity as issuer of the letter of credit, thereby relieving Judge Lifland of the necessity of deciding a contested lift stay/adequate protection motion. The trial record reveals a quite different attitude on Eastern's part when dealing with the banks as Trustees. Stephen Kaplan, a bankruptcy attorney whose firm was retained to advise one of the Trustees, testified that an adequate protection stipulation "was the subject of continuous discussion" with counsel for Eastern, but "Eastern refused to sign a stipulation," Trial Tr.1956–1957, so that a motion by the Trustees would in all likelihood have engaged the attention of Judge Lifland, with the attendant risks Chiste described in his testimony.

It follows that if the Bondholders' proffered evidence of First Fidelity's motion had been admitted, the jury would have been subjected to detailed and time-consuming proof of (1) a transaction different from those at issue at the trial and bearing no relation to them, and (2) conduct by First Fidelity undertaken in materially different circumstances. There was an abundance of evidence, pro and con, bearing directly upon the issue the jury had to decide: whether the defendant banks acted prudently as Trustees. Whatever minimal relevance First Fidelity's conduct as issuer of a letter of credit may have to that issue "is substantially outweighed by the danger of ... confusion of the issues, or misleading the jury, or by considerations of undue delay, [or] waste of time ..." Rule 403. The Bondholders have never dealt adequately with the balancing requirements of that Rule. To the extent that I excluded this evidence under Rule 403, I acted in the exercise of my discretion.

These considerations also require rejection of the first of the two grounds for the admissibility of this evidence that the Bondholders urge in their motion for a new trial, namely, impeaching Chiste's trial testimony. In that testimony, as we have seen, Chiste described his state of mind concerning the timing of a protective motion by the Trustees. Conceptually, a witness's description of a then-existing state of mind may be impeached by evidence of prior inconsistent words or prior inconsistent conduct. In focusing upon First Fidelity's earlier protective motion, the Bondholders seek to bring themselves within the latter category. But the differing circumstances, previously discussed, deprive the proffered evidence of any impeaching value. To the extent that such minimal value may be discerned, Rule 403 operates to exclude the evidence.

The second ground for admissibility the Bondholders urge on this motion is that Chiste's testimony "opened the door" to proof of First Fidelity's protective motion. There is no substance to this contention. The Second Circuit's alias for the "opening the door" rule is "curative admissibility";

the adjective reflects the rule's rationale that it may be necessary to admit otherwise inadmissible evidence in order to "cure" the lingering malignant effect of equally inadmissible evidence previously offered by the opposing party and erroneously received by the trial judge.

A recent statement of the rule appears in *Paolitto v. John Brown E. & C., Inc.,* 151 F.3d 60, 66 (2d Cir.1998):

> "Opening the door" to evidence that has been previously excluded gives the trial court discretion to permit a party to introduce otherwise inadmissible evidence on an issue (a) when the opposing party has introduced inadmissible evidence on the same issue, and (b) when it is needed to rebut a false impression that may have resulted from the opposing party's evidence.

(citation and internal quotation marks omitted). Both elements must be shown to invoke the doctrine. *See United States v. Rosa,* 11 F.3d 315, 335 (2d Cir.1993) (While "[t]he rule of 'opening the door,' or 'curative admissibility,' gives the trial court discretion to permit a party to introduce otherwise inadmissible evidence on an issue, .... [t]o be admissible under this doctrine, the evidence that allegedly 'opened the door' must in fact have been inadmissible. Properly admitted evidence

does not open the door to inadmissible evidence."); *United States v. Forrester,* 60 F.3d 52, 60 (2d Cir.1995) ("In other words, the door must have been opened by the prior use of inadmissible evidence.") (citing *Rosa*); *United States v. Rea,* 958 F.2d 1206, 1225 (2nd Cir.1992) ("To be admissible under the doctrine of curative admissibility, the evidence that allegedly opened the door must in fact have been inadmissible. Properly admitted evidence does not open the door to inadmissible evidence.").

In the case at bar, the Bondholders contend that Chiste's testimony concerning the Trustees' reasons for deferring a lift stay/adequate protection motion in general, and his perception of Judge Lifland's propensities in particular, opened the door to proof of First Fidelity's earlier motion. But the door-opening or curative admissibility doctrine does not apply because Chiste's testimony was not itself inadmissible. The Bondholders do not claim that it was; nor could they, since Chiste (and the other Trustees and their attorneys) were certainly entitled to explain their reasons for the timing of the motion which the Bondholders allege was imprudently delayed. In these circumstances, the doctrine of curative admissibility has no legitimate office to perform.[3]

---

3. At trial, counsel for the Bondholders invoked the "opening the door" doctrine with respect to the testimony of another witness, Kenneth Klee, an attorney who represented certain Bondholders in the Eastern bankruptcy and the Bondholders called as an expert witness. The Bondholders do not reassert this testimony as a ground for a new trial, but the effort would fail if made.

On cross-examination, counsel for certain Trustees placed before Klee a Lexis-generated list of over 100 published opinions written by Judge Lifland during his distinguished career as a bankruptcy judge. Counsel elicited from Klee an acknowledgment that Klee could identify from that list only one case (unrelated to that at bar) where Judge Lifland granted a contested motion for adequate protection. Trial Tr. 1439–1440. Counsel for the Bondholders argued that this testimony "opened the door" to proof of First Fidelity's motion in the Eastern case because "what he [Trustees' counsel] is doing is leaving the implication

that Judge Lifland never granted adequate protection, and we know that that's not true." Trial Tr. 1456.

The Second Circuit cases cited in text preclude any invocation of the "opening the door" doctrine because the testimony elicited from Klee on cross-examination was not inadmissible. A more broad appeal to the correction of a false impression fares no better. Counsel for the Trustees limited his inquiry to the very considerable body of Judge Lifland's published opinions resolving contested motions, a limitation that Klee understood; he observed to counsel that "[y]ou're only talking about the published opinions in bankruptcy reports." Trial Tr. 1439. As noted in text, Judge Lifland did not have to decide whether or not to grant a contested motion by First Fidelity for adequate protection, since Eastern stipulated to such relief. This procedural distinction (1) materially lessened the probative value of the First Fidelity stipulation as a

In summary, I am not persuaded that the evidentiary rulings discussed in this sub-Part were erroneous. But even if they were, the Bondholders have not shown that the exclusion of the peripheral evidence in question was so prejudicial as to "truly harm" their case, which turned on the voluminous evidence introduced by both sides directly addressing the prudence of the timing of the Trustees' lift stay/adequate protection motion.

Accordingly the exclusion of this evidence does not entitle the Bondholders to a new trial.

### C. Evidence Concerning the Affirmative Defenses of Waiver and Ratification

The Bondholders contend that they "are entitled to a new trial because the Court permitted substantial amounts of evidence that only was relevant to affirmative defenses that as a matter of law were untenable—defendants' affirmative defenses of waiver and ratification." Main Brief at 17.

■ The relevance of this particular argument to a motion for a new trial is somewhat obscure. If the jury had decided the case in the Trustees' favor on the basis of affirmative defenses which "as a matter of law were untenable," the Bondholders' appropriate post-trial motion would be for judgment as a matter of law under Rule 50(b). And, in point of fact, counsel for the Bondholders moved under Rule 50(a)(2) for a JMOL on the four affirmative defenses that had survived the *in limine* motion practice (*see* fn. 4, *infra*): champerty, estoppel, waiver, and ratification. The Trustees withdrew the champerty defense. I granted the motion with respect to the estoppel affirmative defense and declined to do so with respect to those of waiver and ratification, instead submitting them to the jury. Trial Tr.2063.

basis for predicting how Judge Lifland would have ruled on a contested Trustees' motion, and (2) would not have been readily comprehended by lay jurors. Accordingly the Rule

But the Bondholders had no occasion to renew their JMOL motion under Rule 50(b) with respect to those two affirmative defenses because the jury never reached them. As noted, the first question which the special verdict form instructed the jury to answer was whether the Bondholders had proved that the Trustees acted imprudently. If the jury answered that question in the negative, they were told to answer no further questions and report their verdict. That is what occurred. The special verdict form, to which the Bondholders made no objection, was structured to prevent the jurors from considering the affirmative defenses of waiver (Question 4) and ratification (Question 5) unless they had first resolved in the Bondholders' favor the issues of prudence (Question 1) and causation (Question 3), which the jurors declined to do. That state of the record requires the Bondholders, seeking a new trial under Rule 59, to argue that they were prejudiced, that is to say "truly harmed," by the admission of evidence relating to issues the jury never reached.

That argument, viewed logically, is something of a stretch, which the Bondholders attempt with the conclusory speculation that "[a] lay juror could not possibly have avoided considering such evidence on the issue of prudence in delaying to make a motion." Main Brief at 22. "Such evidence" consisted of testimony by David K. Sherman, who provided investment analysis about the Eastern transaction to Joseph Steinberg, the president of LNC; Steinberg himself; and Kenneth Klee, an attorney who advised one of the plaintiff Bondholder groups, together with various exhibits identified by those witnesses. The Bondholders' Main Brief at 22 summarizes some of this evidence; a more complete recapitulation appears in the Trustees' Opposing Brief at 11–18.

403 balance also tipped against admitting evidence of the First Fidelity motion in the context of Klee's testimony.

The record does not reveal a sufficient basis to assume that the jury considered evidence elicited by the Trustees to support of their affirmative defenses in determining whether the Trustees had acted prudently. In the first place, it is counterintuitive to suppose that the jury considered evidence of the *Bondholders'* conduct in evaluating the prudence of the *Trustees'* conduct. To the extent that the conduct of these different groups of individuals arose out of the same nexus of facts, it may be noted that the Bondholders sought no limiting instruction as the evidence in support of the affirmative defenses was coming in. Additionally, the issues of Trustee prudence on the one hand, and Bondholder waiver and ratification on the other, were placed before the jury as separate questions on the special verdict form, with instructions from the Court that the jury was to consider the questions separately; indeed, the jury was instructed not to consider the affirmative defenses unless it had first resolved the issue of the Trustees' prudence in the Bondholders' favor. Consistent with that structure, previously made known to the parties, counsel for the Trustees argued the issues separately. Indeed, counsel for NatWest and United Jersey Bank began his summation by stating to the jury that he would discuss the questions of prudence and causation, leaving entirely to counsel for First Fidelity to argue "a third core question," namely, "did the plaintiffs conduct themselves in such a way as to bar their recovery?" Pollack, Tr. 2149. And counsel for First Fidelity, in his summation, dealt initially with the questions of prudence and causation before coming to "my final argument," namely, that "the defendants have met their burden of showing that the plaintiffs waived their claims and ratified our actions." Taube, Tr. 2202. Lastly, during deliberations the jurors did not send any note suggesting that they misunderstood the separateness of these questions or that they were considering evidence relating to the affirmative defenses while evaluating the prudence of the Trustees' conduct.

In these circumstances, the Bondholders' theory of prejudice rests entirely upon speculation which finds no support in the record, and cannot form the basis for a new trial.

■ Quite apart from these considerations, which establish the Bondholders' inability to demonstrate prejudice, the second of the two elements that must be shown to obtain a new trial based upon evidentiary rulings, the Bondholders fail equally to make the first showing, that the evidence in question was admitted in error. The Second Circuit itself, setting the stage for the second trial, explicitly acknowledged the conceptual possibility of the Trustees' defeating the Bondholders' claims on the ground of one or another of the affirmative defenses. The court of appeals observed that "[a]lthough the Bondholders' knowledge or lack of reliance cannot defeat a finding of causation in this case, the Bondholders' knowledge of the Trustees' imprudence may be relevant to affirmative defenses such as waiver, estoppel, or ratification," 173 F.3d 454 (citations omitted), and went on to say:

> [T]he Trustees may be able to establish waiver, estoppel, ratification or similar affirmative defenses based on evidence other than or in conjunction with the Bondholders' pre-purchase knowledge of the Trustees' failure to make the [lift stay/adequate protection] Motion. We leave it to the district court on remand to determine whether the Trustees have proffered sufficient evidence to sustain the presentation of any affirmative defenses to the jury, with appropriate instructions regarding the elements of each defense, burden of proof, and General Obligations Law § 13–107(1).

*Id.* (footnotes omitted).

It is obvious that the Bondholders, on their Rule 59 motion, cannot characterize as irrelevant evidence proffered by the Trustees to sustain affirmative defenses which the court of appeals held the Trust-

ees were entitled to prove if they could.[4] Accordingly such evidence was admissible, so long as it did not offend other Rules of evidence, which it did not. If the Bondholders mean, by their contention that the evidence in question "only was relevant to affirmative defenses [waiver and ratification] that as a matter of law were untenable," to argue that the evidence was therefore *inadmissible,* the argument fails in the face of the court of appeals' characterization of these defenses as propositions the Trustees were entitled to try to prove. If the Bondholders mean to say that the trial proof was insufficient to submit these defenses to the jury, that is a ground for a JMOL under Rule 50, which the Bondholders applied for and I denied.

In sum, it is clear that the admission of this evidence cannot support a motion for a new trial under Rule 59, because (a) the evidence was admissible and (b) the Bondholders have not, and cannot, demonstrate that the admission of the evidence caused them unfair prejudice. Either reason is sufficient to deny a new trial based on the admission of the Trustees' evidence in support of their affirmative defenses.

D. *Evidence Concerning Oral Advice Given to the Trustees by their Bankruptcy Counsel*

The Bondholders next contend that they are entitled to a new trial "in which defendants are not permitted to introduce evidence of oral advice of counsel and the jury is instructed that defendants were only entitled to rely on written advice of counsel." Main Brief at 23.

It is indeed the fact that the Trustees were permitted at trial to adduce evidence with respect to oral advice given to them by bankruptcy attorneys retained to advise the Trustees in the discharge of their responsibilities after Eastern filed its bankruptcy petition. Officers of the Trustee banks described the oral advice given to them by counsel. Some of the attorneys thus retained described their oral communications to the bank officers. This evidence was admitted as probative of the prudence of the Trustees' conduct, with particular reference to the timing of their lift stay/adequate protection motion.

The Bondholders have always contended, and maintain on this Rule 59 new trial motion, that a proper reading of the Trust Indenture precluded the Trustees from relying upon (and accordingly offering proof of) any advice of counsel that was not in writing. Consistent with that view, the Bondholders moved *in limine* to preclude the Trustees from introducing into evidence at trial any advice of counsel, or any evidence concerning such advice, other than written advice of counsel.

I denied the Bondholders' motion in *LNC XII,* reasoning principally that although the "contractual defense" against claims of trustee imprudence found in the Indenture, "which is absolute, is limited by Section 9.03(c)'s requirement that the advice be in writing," the common law defense of advice of counsel, "which consid-

4. The court of appeals instructed this court on remand "to determine whether the Trustees have proffered sufficient evidence to sustain the presentation of any affirmative defenses to the jury," 173 F.3d at 464. In their answer the Trustees pleaded six affirmative defenses: ratification/acquiescence; waiver; estoppel; assumption of the risk; contributory/comparative negligence; and lack of standing to sue based on champerty. The Bondholders moved *in limine* to dismiss all six defenses. In *LNC II* I denied the Bondholders' motion as to champerty. In *LNC III* I granted that motion as to assumption of risk and contributory/comparative negligence, concluding that these defenses were not available to the Trustees as a matter of law, but denied the motion as to ratification, waiver, and estoppel. As the result of these rulings, the Trustees were entitled to offer evidence at trial in support of the affirmative defenses of champerty, ratification, waiver, and estoppel. At the conclusion of the proof the Trustees withdrew the champerty defense; I granted the Bondholders' Rule 50(a)(2) motion to dismiss the estoppel defense; and submitted the ratification and waiver defenses to the jury, which in the circumstances described in text never had to consider them.

ers the advice of counsel as one of several factors in evaluating the prudence of the client's conduct, is neither created nor limited by the contract, unless the contract says so explicitly," which the Indenture did not. 2000 WL 1211584 at *4. The Trustees' entitlement to assert that common law defense, I concluded, necessarily entitled them to offer evidence of the oral advice of their bankruptcy attorneys.

I adhere to that ruling, and have nothing to add to the opinion in *LNC XII*. Because for the reasons stated therein this evidence was admissible, its admission does not provide a ground for a new trial.

### E. *Evidence Concerning Appraisals of the Value of Eastern's Aircraft*

Lastly, the Bondholders contend that they are entitled to a new trial "in which defendants are not permitted to offer evidence of [Eastern aircraft] appraisal values of which [the Trustees] never became aware." Main Brief at 24. As a collateral argument, the Bondholders say that having admitted appraisal value evidence on the Trustees' case in chief, the Court erred in precluding the Bondholders from calling an appraiser as a rebuttal witness.

To place these contentions in context, it is useful to recall that in a pre-trial ruling I bifurcated the trial between issues of liability and damages, stating my reasons for doing so in *LNC IV*.[5] In that opinion, focusing upon the time-saving benefit of bifurcation, I observed that "quantifying Plaintiffs' damages, if they prevail on liability, will confront lay jurors with complex, even arcane, evidence drawn from both fact and expert witnesses; evidence that would not be necessary, or even appropriate, to resolve the issue of liability." 2000 WL 422399 at *2. Subsequently I stated:

> There is no discernible reason why the liability phase of the retrial cannot

be structured to permit a jury finding of "any injury" in a manner that will save the substantial amount of time necessary to establish "an exact dollar amount" if Plaintiffs win on liability. After all, the gist of Plaintiffs' claim is that while the Defendants fiddled, Plaintiffs' collateral burned, or, in less vivid terms, lost its value. The collateral originally consisted of Eastern's fleet of aircraft; subsequent sales of part of the fleet created a "cash collateral account" as a second component, together with the remaining aircraft, in the "collateral pool." If, when Eastern ceased operations, the collateral pool had been sufficient to pay Plaintiffs' claims, this action would not have been filed. Presumably Plaintiffs can show without difficulty the amounts they paid for their bonds and the fact that the bonds are now worthless. . . .

> It would seem that Plaintiffs would satisfy the proximate cause element on liability if they proved (1) the collateral's rate of decline over time, and (2) that Defendants' failure to act at some point or points along that time line (a) was imprudent and (b) adversely affected Plaintiffs' secured position. Such or comparable proof would permit the jury to find that the Defendants' conduct caused Plaintiffs some economic loss, leaving the far more complex calculations of the precise amount or amounts of Plaintiffs' damages for the second phase. While some proof of damages is necessary to show that Defendants' conduct caused Plaintiffs some harm, bifurcation will nonetheless accomplish significant efficiencies if Plaintiffs lose on liability.

*Id.* at *3–4 (citation to court of appeals' opinion omitted).

Accordingly the trial on the liability phase presented two related but discrete

---

**5.** Judge Mukasey had similarly bifurcated the first trial between the issues of liability and damages.

issues: whether the Trustees' conduct was imprudent; and, if it was, whether that imprudence caused the Bondholders economic loss. These two components of liability reflect converse propositions of Hornbook familiarity: an actor's conduct, even if wrongful, is not actionable if it causes no harm to another; conversely, the harm one suffers is not actionable unless caused by the wrongful conduct of another.

The Second Circuit gave voice to these principles in this very case: "[W]here damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant's conduct proximately caused injury in order to establish liability." 173 F.3d at 465. It would be for a properly instructed jury to determine "whether the Trustees breached their duty of prudence by failing to make the Motion earlier and, if so, what damages are specifically attributable to that failure." *Id.* at 469.

Thus the special verdict form on the second trial directed the jurors first to decide whether the Trustees had acted imprudently; only in the event of an affirmative answer were they to consider, in answering Question 3, whether that imprudence "proximately caused an economic loss to plaintiffs."

Before addressing the merits of the Bondholders' present contentions, an additional ruling by this Court should be noted. First Fidelity moved *in limine* to exclude trial testimony of John Vitale, the Bondholders' aircraft valuation expert who testified at the first trial, as well as evidence relating to post-January 1991 aircraft appraisals and sales information. At the first trial the Bondholders' counsel elicited from Vitale testimony that during the period from March 1989 through July 1989, the "trust aircraft" declined in value. Vitale described in general terms the reasons why that was so. He gave comparable testimony with respect to the periods

January 1990 to July 1990, and July 1990 through January 1991. With respect to each of those later periods, Vitale described in general terms the facts which caused the value of the aircraft to decline. Vitale also described the manifestations of market conditions occurring during those times which would indicate a decline in the value of these commercial aircraft. On his direct examination by the Bondholders' counsel Vitale did not specify any dollar amounts representing the diminution in value of the aircraft during the several periods of time to which he referred.[6]

Seeking to preclude Vitale from giving such testimony at the second trial, counsel for First Fidelity referred to Vitale's written report (which was not placed in evidence at the first trial) and his deposition. Those sources indicated that Vitale had expressed "numerical opinions" or "numerical conclusions" which, to some extent, "were based on transactions and appraisals which occurred subsequent to the 'study period' pertinent to the case, namely 1989 to January 1991." *LNC XIII* at slip op. 2. Therefore, First Fidelity argued, Vitale's testimony at the second trial should be precluded, "as violative of the rule that the prudence of a fiduciary's conduct can be judged only on the basis of facts existing at the time the fiduciary acted or failed to act, and not by 'hindsight.'" *Id.* First Fidelity made the same argument in seeking to exclude the Bondholders from offering into evidence aircraft valuation documents generated subsequent to January 1991.

In *LNC XIII* I denied First Fidelity's motion in its entirety. I reminded counsel that "the second trial, as was the first, is bifurcated between questions of liability and damages," and went on to say:

> Vitale was qualified to describe in general terms the diminution of value of the aircraft during pertinent periods of time, the reasons for that diminution, and indications that it was occurring. . . .

---

6. The description of Vitale's testimony at the first trial appearing in text is adapted from

this Court's decision in *LNC XIII* at slip op. 1–2.

In short, the opinion testimony that Vitale gave at the first trial is relevant to the issues of Trustee imprudence and loss causation, and there is no basis for precluding Vitale from giving such evidence during the second trial.

*Id.* at slip op. 3–4. As for the post–1991 valuation documents, I accepted the Bondholders' argument that they were relevant to the causation issue. On that point I said:

As for post-January 1991 documents, plaintiffs are required on the liability aspect of their case to prove that the defendants' action or lack of action caused plaintiffs a significant economic loss. The precise quantification of that loss remains for the damages part of the trial, if the case goes that far. But clearly plaintiffs are entitled to place evidence before the jury on the liability aspect of the case to demonstrate that they suffered an economic loss which cannot be shrugged off as *de minimis.*

*Id.* at slip op. 4.

Notwithstanding their victory in the *in limine* skirmish over the admissibility of Vitale's testimony, the Bondholders did not call Vitale as a witness in their case in chief. The reason given by the Bondholders' counsel, expressed on September 26, 2000 as the trial approached its conclusion, was that "I couldn't get in touch with my witness in Nice until this morning when it became impossible to get him back here for tomorrow." Tr.2005. The "witness" was not identified in that particular colloquy, but it became apparent later that it was Vitale. Counsel for the Bondholders sought to call a Mr. Ben–Josef as a substitute for Vitale, and stated that in any event "I still wouldn't have called Mr. Ben–Josef or Mr. Vitale on my direct case because I think they are rebuttal witnesses," adding as to Ben–Josef that "I wouldn't have used him except for Vitale's unavailability." Tr.2042.

I precluded Ben–Josef from testifying (and would have precluded Vitale had he not been in Nice) because their proffered testimony concerning aircraft valuations could not conceivably be characterized as rebuttal evidence. During a colloquy earlier in the trial, on September 18, I advised counsel of the Wigmore—derived limitations I would place upon rebuttal evidence:

As far as rebuttal cases are concerned, I will say to you all, primarily, of course, to the plaintiff who is likely to put in rebuttal, although defendants may also want to put in surrebuttal, I follow Professor Wigmore's policy, which is very much against trial by piecemeal stages. My view of rebuttal is that it is appropriate only if it is intended to put in evidence or proof in respect of a claim or defense which could not reasonably have been foreseen and consequently included in the rebutting party's case in chief. So I don't know if that policy will apply to this situation or not, but I am simply telling you the rules of rebuttal that I enforce.

Tr. 786. The pertinent principles are stated in VI *Wigmore on Evidence* (rev. ed.1976) at 672:

It is clear that the orderly presentation of each party's case would leave the proponent nothing to do, in his case in rebuttal, except to meet the new facts put in by the opponent in his case in reply. Everything relevant as a part of the case in chief would already have been put in; and a rebuttal is necessary only because, on an plea in denial, new subordinate evidential facts have been offered or because, on an affirmative plea, its substantive facts have been put forward or because, on any issue whatever, facts discrediting the proponent's witnesses have been offered.

*Wigmore* notes "the interminable confusion that would be created by an unending alternation of successive fragments of each case which could have been put in at once in the beginning," and concludes that "the usual rule will exclude all evidence which has not been made necessary by the opponent's case in reply." *Id.*

In the case at bar, whether or not aircraft values were declining during the period prior to the Trustees' making their motion obviously went to the issue of causation, since if those values stayed constant, the Trustees' delay caused the Bondholders no economic harm. As previously noted, causation was a separate element which the Bondholders had the burden of proving to establish the Trustees' liability for their losses. The Bondholders could and should have called Vitale as a witness during their case in chief; they did so at the first trial; and one would have thought that the Bondholders successfully opposed the Trustees' *in limine* motion to preclude Vitale's testimony so that they could call him as a witness during their case in chief at the second trial. The fact that when the time came Vitale was not in the country does not alter these realities. It is the responsibility of counsel to ensure the attendance of a party's trial witnesses, either "live" at the trial or by deposition.

On the present motion, the Bondholders argue that the testimony of Vitale (or Ben–Josef, his substitute) would constitute proper rebuttal to appraisal evidence that the Bondholders contend was erroneously admitted during the Trustees' case in chief. I do not agree.

The questions involved are illustrated by the testimony of William H. Bath, an aircraft appraiser called by the Trustees on their case in chief to give expert opinion testimony with respect to the value of the Eastern fleet during the pertinent times. Bath testified that in late June or early July 1990, the chief financial officer of Eastern requested him to undertake a full appraisal of Eastern's aircraft. Tr. 1590–91. Bath described his appraisal methodology and testified that he completed his appraisal and report to Eastern on August 1, 1990. Tr. 1590–91. Counsel for First Fidelity, conducting Bath's direct examination, then put this question: "At the time you performed this appraisal back in the summer of 1990, what did you observe or learn, if anything, regarding the maintenance condition of these aircraft at that time?" Tr. 1592.

Counsel for the Bondholders objected to that question. The jury was excused and a colloquy ensued. *See* Tr. 1593–1601. Bath, who was retained by Eastern, had not furnished his report to the Trustees. That led counsel for the Bondholders to argue that Bath's valuations were irrelevant "because the trustees didn't know anything about them. This was not part of their knowledge. And it is their state of mind that is in issue here." Tr. 1593. Counsel for the Trustees argued that Bath's valuations were relevant "to prudence as well as causation." Tr. 1600. We are thus presented with the entertaining spectacle of counsel for both sides executing 180–degree changes of course and arguing the opposite side of the contentions they made in *LNC XIII*, when the admissibility of the opinions of Vitale, the Bondholders' appraisal expert, were at stake.

The ruling I made at trial with respect to Bath's testimony mirrored the *in limine* ruling with respect to Vitale's. I regarded Bath's opinions on valuing the Eastern aircraft as "probative evidence" which was "fundamentally related to the issue of causation." Tr. 1600–01. Counsel for the Bondholders requested a limiting instruction. I granted that request, recalled the jury, and gave a limiting instruction. In their present motion, the Bondholders quote part of the instruction, *see* Main Brief at 27, and complain that it was insufficient. But counsel made no objection to the instruction as delivered; its full text appears in the margin,[7] and I believe it to be adequate for the purpose.

7. I charged the jury as follows:
 Members of the jury, I took a little longer than I thought I would. You are about to hear some testimony from Mr. Bath. There is a particular instruction I want to give to you before your hear it, and that instruction will relate to the issue for which you may consider this testimony and the issue for which it does not apply and should not be considered.

The decisive point on this aspect of the case is that the Bondholders, on their case in chief, should have introduced expert appraisals of the Eastern aircraft collateralizing the certificates, as probative of a causal connection between the Trustees' delay in making the motion and the economic loss ultimately suffered by the Bondholders. That causation issue had been known to both sides since day one of the case. The Trustees' awareness of the issue led to their offering, in their case in chief, *inter alia*, the expert opinions of Bath, who testified that Eastern's collateralized aircraft maintained their values [8] until late 1990 and early 1991, when extraneous events such as the Gulf War and the bankruptcies of Continental Airlines and Pan–Am Airlines combined to lower the values of used commercial aircraft. That evidence supported the Trustees' contention that the timing of their lift stay/adequate protection motion, made in November 1990, did not proximately cause the diminution of the Trust collateral and the consequent economic loss suffered by the Bondholders. The need for contrary evidence on this point, as part of the Bondholders' case in chief, was equally apparent, and the proffered evidence of an aircraft appraiser, be he Vitale on Ben–Josef, cannot be characterized as legitimate rebuttal.

Lastly, the Bondholders complain of a ruling that precluded them from eliciting, during cross-examination of Bath, the substance of aircraft market predictions contained in newsletters published by Avitas, an appraisal firm. Bath had testified that he was "familiar with the industry publications of a company by the name of Avitas," and that "[w]e received about two or three in our whole existence, I would say, maybe four." Tr. 1641. On the basis of that testimony, counsel for the Bondholders asked Bath: "Do you recall what they were predicting was going to happen in the market for used narrow body aircraft in March and April of 1990?" Objection was made on the ground that the contents of the Avitas publications would constitute inadmissible hearsay. I sustained the objection because Bath's testimony did not lay a sufficient foundation under either Rule 803(17) or Rule 803(18), F.R.Evid., the only arguable exceptions to the hear-

I think I can approach that best by saying, as I think you have probably already figured out, that there are two fundamental questions in this case, the first one being the question of prudence, prudent conduct on the part of the trustees, and the second question being what we call in law causation.

When you address the first question you will have to decide on the prudence issue whether, during the course of their responsibilities, the trustees, the defendant banks in this case, acting as prudent people, as prudent trustees, either did things which they ought not to have done or did not do things which they ought to have done.

Secondly, you will come to the question of causation, and that is if you should find that either the trustees did things that they ought not to have done or did not do things that they ought to have done, did that imprudent conduct cause any damage, any economic loss, to the plaintiff certificate holders in this case?

What you are about to hear from Mr. Bath has nothing to do and should not be considered in your resolution of the first question: Was the trustees' conduct pru-

dent or imprudent? The reason for that is that the appraisal you are about to hear about was never communicated to the trustees. The trustees' conduct will be judged on the basis of what they knew. But you may consider this testimony on the question of causation. In other words, you may consider it on the issue of whether, if the trustees had either done those things which the plaintiffs claim they imprudently failed to do or *vice versa*, would it have made any difference, would the plaintiffs have suffered economic loss, even if the trustees had done what the plaintiffs criticize them for not doing? It is on that issue of causation that this testimony relates to, and you should consider it only with respect to that particular issue.

8. Bath testified that on August 1, 1990, the remaining collateral aircraft had a total value of $489,430,000. The stipulated amount of cash collateral at that time, generated by the prior sale of other collateral aircraft, totaled $217,000,000, so that the total amount of collateral securing the Trust on August 1, 1990 was $707,000,000. Tr. 1605.

say rule. Tr. 1643 ("I will sustain the objection on this record."). On this motion the Bondholders do not persuade me that this ruling was wrong.

In short, the evidentiary rulings discussed in this sub-Part were not erroneous. Accordingly they cannot support a motion for a new trial.

Quite apart from that consideration, the Bondholders cannot show that they were prejudiced by any of these rulings. That is because the evidence in question related solely to, and was admitted solely on, the issue of causation, as the jury was explicitly instructed in the course of Bath's testimony. Since the jury ruled in the Trustees' favor on the issue of prudence, and consequently never reached the issue of causation, the Bondholders have also failed to establish the second element necessary to obtain a new trial based on evidentiary rulings.

## V. CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for judgment as a matter of law under Rule 50(b), Fed.R.Civ.P., or in the alternative for a new trial under Rule 59, is denied in its entirety.

It is SO ORDERED.